Frank Jose TREJOS, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–05–00646–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

May 24, 2007.

Discretionary Review Refused
Nov. 7, 2007.

Donald W. Bankston, Richmond, TX, for Appellant.

John F. Healey Jr., Fort Bend County, District Attorneys Office, Richmond, TX, for Appellee.

Panel consists of Justices TAFT, ALCALA, and HANKS.

## OPINION

ELSA ALCALA, Justice.

Appellant, Frank Jose Trejos, appeals a judgment convicting him of the murder of Maria Barrientos, his mother-in-law. *See* TEX. PEN.CODE ANN. § 19.02(b)(1) (Vernon 2003). Appellant pleaded not guilty to the jury. The jury found him guilty and assessed punishment at 45 years in prison. In seven issues, appellant contends that the trial court erred (1) by granting the State's motion to shuffle the venire panel because the motion was untimely after voir dire had commenced, (2) by granting the State's motion to amend the indictment to add the name of the complainant on the day of trial, (3) by admitting his statements that he made to police officers, (4) by admitting testimony concerning the findings of cadaver dogs because there was no showing of the reliability of the dogs or, alternatively, the probative value of the testimony was outweighed by its prejudicial effect or the danger of confusing the issues, and (5) by denying his motion for instructed verdict because "the State failed to prove *corpus delicti.*" We conclude that the State's motion to shuffle was timely because it was made before the State began its voir dire. We also conclude that the trial court's amendment of the indictment to add the name of the complainant on the day of trial was harmless error. Further, we conclude that the trial court did not err by admitting appellant's statements to officers, by admitting the evidence regarding the cadaver dogs, or by denying appellant's motion for instructed verdict. We therefore affirm.

## Background

In 1994, appellant and his wife lived with Maria Barrientos, his mother-in-law. On June 10, 1994, after she was paid for her work as a nanny, Maria left work at 5:00 p.m., and was never seen again. According to her employer, she was not ill and she did not quit. The next day, when Margarita Torres called Maria's house to speak with her, appellant told her that Maria left because she was angry with him for not mowing the lawn.

Four days after Maria was last seen, appellant reported to the police that she was missing, but neither he nor his wife helped Maria's friends post missing persons fliers, nor did they make any other attempts to find her. Detective Glenn White of the Sugar Land Police Department was assigned to Maria's case two

days after the report was filed. His investigation did not reveal any activity with her work or church. Maria's bank account had a small balance remaining and there was no activity in that account, even though Maria did not have much money. And although she was known to take her bible with her everywhere, Detective White found it in her house.

On June 29, the Houston Police Department Crime Laboratory processed Maria's house. Testing revealed a "presumptive test for blood" on adult footprints in the kitchen and the hallway and on a towel in the bathroom.[1] The towel was sent to the Department of Public Safety ("DPS") for follow-up testing, but the test showed that there was no "apparent blood."[2] The following day, Maria's car, with the keys still in the ignition, was found abandoned less than two miles from her ex-husband's house. Maria's purse was in the car. A presumptive test showed the presence of possible blood on the floormats in the back floorboard of the car.

In July 1994, appellant, who appeared casual and nonchalant, met with police officers to discuss Maria's disappearance. According to appellant, he last saw Maria asleep at her house, when he and his wife left the house at around 9:30 or 10:30 p.m. on Friday, June 10. Appellant reported that, when he and his wife returned to the house, the door to the house was ajar, Maria's car was missing, and Maria was

gone. Appellant laughed when asked what was the last thing he heard Maria say. When asked where he went on the evening of June 10, appellant gave detailed directions rather than stating a general destination. Appellant also stated that Maria had mopped her kitchen floor. However, the floor was being re-tiled and was concrete. Also, everywhere that appellant said that Maria had mopped "presumptively tested positive" for blood.

In November 2001, seven years after Maria disappeared, Detective White asked DPS Sergeant Enrique Muniz for assistance in the investigation. On November 7, Sergeant Muniz, Detective White, and other officers went to appellant's apartment. They told appellant that they wanted to talk to him about the case and that he was not under arrest, and they asked him to come to the Sugar Land Police Department. Appellant agreed. Because he did not have a car, appellant rode with Muniz in an unmarked pickup truck. Once at the Department, appellant and the officers went into an office in a temporary, portable building because the Department was being re-modeled. Detective White told appellant that he was free to leave. Appellant then gave a statement that was recorded on audio tape. On the tape, appellant acknowledged that he had been read his "*Miranda* warning"[3] before the recording started.[4]

---

1. Pamela McInnis, a serologist, testified that Luminol is a chemical agent used to help find areas where there might be diluted blood stains that cannot be seen. It is called a presumptive indicator of the existence of blood because it reacts and glows when it comes in contact with other substances in addition to blood.

2. DPS was unable to detect any blood; however, the test did not rule out the presence of blood.

3. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).

4. Specifically, appellant was read the warnings in article 38.22 of the Texas Code of Criminal Procedure. Article 38.22 prescribes the requirements to make oral custodial statements admissible at trial and, among other things, codifies the *Miranda* warnings required to be given prior to custodial confessions. Tex.Code Crim. Proc. Ann. art. 38.22, § 3(a) (Vernon 2005); *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630. However, article 38.22 requires a fifth warning not explicitly re-

In his statement, appellant said that he was angry with Maria for nagging him. When she "came up in [his] face" he struck her with his fist. She fell to the kitchen floor. Maria was bleeding and "freaking out," so appellant choked her. After Maria was dead, appellant and his wife took her to the bathroom and placed her in the tub. Appellant's wife cut Maria's wrists to try to make it look like she committed suicide, but the wounds did not bleed. Appellant and his wife put Maria's body in the trunk of their car and dumped her body in a ditch.

It took less than one hour for appellant to make this statement. When he was done, appellant waited in the lobby. He was not arrested, nor was he told that he could not leave. Sergeant Muniz told Detective White that appellant had confessed to killing Maria. Detective White took a second recorded statement from appellant later that evening. He also read appellant the warnings in article 38.22 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (Vernon 2005). Appellant acknowledged that he had received these warnings by initialing next to each warning on a form. This statement also took appellant less than one hour to make. When it was done, appellant went with other detectives to show where he and his wife had disposed of Maria's body.

Appellant returned to the police department around 1:00 a.m. He and his wife were told that they were free to leave. Appellant, however, agreed to give a third recorded statement. Detective White began reading the article 38.22 warnings to appellant, but appellant finished them, quoting them to Detective White. After this last statement, appellant left with his wife.

That afternoon, appellant drove himself to the Sugar Land Police Department and spoke with Detective White again. This conversation was also recorded. Appellant then went with Detective White to Maria's house to clarify some of the details of the murder. Appellant demonstrated what had occurred. This walkthrough of the crime scene was videotaped.

On November 9, 2001, police officers took two dogs trained to detect the scent of cadavers to the location where appellant said that he and his wife had dumped Maria's body. The two cadaver dogs and their handlers worked the area independently of one another so that they would not influence each other. Both dogs alerted within five or six feet of one another, at the spot that appellant had indicated he had placed the body. Although an excavation was performed, no remains were found.

On December 23, 2002, a grand jury indicted appellant for Maria's murder. The indictment read,

> The duly organized Grand Jury of Fort Bend County, Texas, presents in the District Court of Fort Bend County, Texas, that in Fort Bend County, Texas, Frank Jose Trejos, hereafter styled the Defendant, heretofore on or about June 11, 1994, did then and there
>
> Paragraph A
>
> intentionally and knowingly cause the death of an individual, MARIA BARRIENTOS, by CHOKING HER.
>
> Paragraph B
>
> intentionally and knowingly cause the death of an individual, by A MANNER AND MEANS UNKNOWN TO THE GRAND JURY.

---

quired under *Miranda,* namely that the accused "has the right to terminate the interview at any time." Tex. Code Crim. Proc. Ann. art 38.22, § 2(a).

Appellant was arrested on December 30, 2002.

On the day of trial, the venire was seated in the courtroom. The trial court asked the prospective jurors various questions. Each question was followed by silence in response. The trial court asked if anyone knew appellant, and one member of the venire raised his hand in response to the question. Immediately before the State began its voir dire, the State requested a jury shuffle. Appellant's counsel objected that the request was untimely because the trial court had already asked many voir dire questions that were of the type likely to be helpful to the parties. The trial court overruled the objection and granted the State's request for a jury shuffle.

After the completion of voir dire, appellant moved to strike paragraph B of the indictment, alleging that it was void because the second manner and means paragraph did not include the complainant's name, Maria Barrientos. The State then verbally requested that the indictment be amended to add Maria's name. Over appellant's objection, the trial court allowed the amendment by handwriting "Maria Barrientos" into paragraph B of the indictment.

## Jury Shuffle

 In his first issue, appellant asserts that the trial court erred by allowing a shuffle of the venire "after voir dire had effectively commenced." Under article 35.11 of the Texas Code of Criminal Proce-

dure, a party is entitled, upon timely demand, to have the jury panel for the case shuffled. Tex.Code Crim. Proc. Ann. art. 35.11 (Vernon 2006). A shuffle has the effect of randomly reordering the names of prospective jurors on the jury list. *Montez v. State*, 975 S.W.2d 370, 371 (Tex.App.-Dallas 1998, no pet.). A motion to shuffle is untimely if presented after voir dire has commenced. *Davis v. State*, 782 S.W.2d 211, 214 (Tex.Crim.App.1989).

 Determination of when voir dire has commenced depends on whether the trial is a capital trial in which the State is seeking the death penalty or a non-capital trial.[5] In a non-capital case, as here, a motion to shuffle is timely as long as the motion is made before the State actually starts questioning the jurors in its portion of the voir dire. *DeLeon v. State*, 731 S.W.2d 948, 949 (Tex.Crim.App.1987); *Williams v. State*, 719 S.W.2d 573, 577 (Tex.Crim.App.1986). Regardless of the length or detail of the trial court's questions to the venire panel in a non-capital case, the bright-line rule is that the motion to shuffle the venire is timely when it is made before the State begins questioning the potential jurors. *See Williams*, 719 S.W.2d at 577 (holding motion to shuffle venire timely although for forty minutes, "the trial judge introduced herself and made introductory remarks, identified the attorneys, pointed out the appellant and his co-defendant, Raymond Jackson, discussed the division of offenses into felonies and misdemeanors, gave examples of felo-

---

**5.** In a capital trial in which the State is seeking the death penalty, and thus prospective jurors are individually questioned during voir dire, a different test determines when voir dire begins for the purpose of a timely request of a jury shuffle. *Davis v. State*, 782 S.W.2d 211, 215 (Tex.Crim.App.1989); *see also* Tex. Code Crim. Proc. Ann. art. 35.17(2) (Vernon 2006) ("In a capital felony case in which the State seeks the death penalty, the court shall

propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion."). Voir dire begins in a capital felony case in which the State seeks the death penalty when the court, rather than the parties, begins questioning the venire. *Davis*, 782 S.W.2d at 215.

nies of the first, second and third degree and the applicable penalties, discussed capital murder and its penalties and the high fines now available in cases of 'drug trafficking,' read the instant indictment to the panel, told them the offense was formerly known as aggravated rape, discussed jury strikes, the order of trial, the charge, jury deliberations, verdicts, and referred to certain principles as presumption of innocence, burden of proof, reasonable doubt, etc.").

The State's motion to shuffle was timely in this non-capital case because it was made before the State began its voir dire. *See DeLeon*, 731 S.W.2d at 949; *Williams*, 719 S.W.2d at 577. We hold that the trial court did not err by granting the State's motion to shuffle the jury panel.

We overrule appellant's first issue.

### Amendment of Indictment

In his second issue, appellant challenges the trial court's grant of the State's motion to amend the indictment on the day of trial. Specifically, appellant contends that, because the original indictment failed to include the complainant's name in the second paragraph of the indictment, the second paragraph was void. Appellant also asserts that allowing the State to amend the indictment on the day of trial had a substantial and injurious effect that harmed him. The State contends that appellant waived his right to challenge the indictment by not filing a pre-trial motion attacking the indictment and, in the alternative, that if the amendment was error, it was harmless.

### A. Indictment Not Void

■ On the day of trial, appellant objected that the indictment was void because it did not include Maria's name in the second paragraph. "An indictment is a written instrument presented to a court by a grand jury that charges a person with the commission of an offense." *Duron v. State*, 915 S.W.2d 920, 921 (Tex.App.-Houston [1st Dist.] 1996) (citing Tex. Const. Art. V, § 12(b)), *aff'd*, 956 S.W.2d 547 (Tex.Crim.App.1997). However, the Court of Criminal Appeals has recognized that "[s]ome defects . . . render the instrument a non-indictment." *Duron v. State*, 956 S.W.2d 547, 550 (Tex.Crim.App.1997) (citing *Cook v. State*, 902 S.W.2d 471, 478 (Tex.Crim.App.1995)) (explaining that "those defects [are] of the type that would make it impossible for the defendant to know with what offense he had been charged."). In *Duron*, the court held that "a written instrument is an indictment or information under the Constitution if it accuses someone of a crime with enough clarity and specificity to identify the penal statute under which the State intends to prosecute, even if the instrument is otherwise defective." *Id.* at 550–51.

■ The pertinent statute here is the charge of murder in the Texas Penal Code. In Texas, a person commits the offense of murder if he "intentionally or knowingly causes the death of an individual." Tex. Pen.Code Ann. § 19.02(b)(1). The complainant's name is not a statutory element of the criminal offense. *Fuller v. State*, 73 S.W.3d 250, 253 (Tex.Crim.App.2002) (holding that "[s]tate law does not define the victim's name as a substantive element of the offense by, for example, defining the offense as 'injury to an elderly individual named Olen M. Fuller.' "); *Rodriguez v. State*, 137 S.W.3d 758, 761 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (holding that "[s]tate law does not define the victim's name as a substantive element of the offense by, for example, defining the offense as 'endangerment of a child under 15 named Alexander Rodriguez.' "). The second paragraph of the indictment, which states that appellant "intentionally and

knowingly cause[d] the death of an individual by a manner and means unknown to the grand jury" includes all of the elements of the offense, and thus the failure to include Maria's name does not make it void. *See* TEX. PEN.CODE ANN. § 19.02(b)(1); *Fuller*, 73 S.W.3d at 253; *Rodriguez*, 137 S.W.3d at 761.

## B. Waiver by Appellant

The State contends that we should hold that appellant waived his right to challenge the indictment because he failed to object to the indictment prior to trial. *See Duron*, 915 S.W.2d at 922; TEX.CODE CRIM. PROC. ANN. art. 1.14(b) (Vernon 2005). In *Duron*, this Court stated that "all defects of form and substance [in an indictment] are waived if the defendant does not object before the date on which the trial begins." *Id.* The issue here is not whether appellant properly challenged the indictment. The issue is whether the trial court properly amended the indictment on the day of trial. We conclude that appellant did not waive his right to challenge the State's amendment of the indictment on the day of trial.

## C. Amendment of Indictment

After appellant objected that the indictment was void due to its failure to name Maria in the second paragraph, the State requested that the court amend the second paragraph of the indictment to add Maria's name. Appellant objected and the trial court overruled appellant's objection to the amendment. According to the Code of Criminal Procedure, a motion to amend the indictment made on the day of trial, as here, can only be granted "if the defendant does not object." *See* TEX.CODE CRIM. PROC. ANN. art. 28.10(b) (Vernon 2006).[6] Because appellant objected to the State's motion to amend the indictment on the day of trial, it was error for the trial court to grant the amendment. *See id.* We must determine whether the trial court's erroneous ruling under article 28.10 of the Code of Criminal Procedure is harmless error under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *See Wright v. State*, 28 S.W.3d 526, 531–32 (Tex.Crim.App. 2000); *Flores v. State*, 139 S.W.3d 61, 65–66 (Tex.App.-Texarkana 2004, pet. ref'd); *Valenti v. State*, 49 S.W.3d 594, 598 (Tex. App.-Fort Worth 2001, no pet.).

Under Rule 44.2(b), we are required to disregard errors, defects, irregularities, or variances that do not affect the accused's substantial rights. TEX.R.APP. P. 44.2(b). An error affects a substantial right "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997). If looking at the record as a whole, it appears the error "did not influence the jury, or had but a slight effect," we must consider the error harmless and allow the

---

6. The Code of Criminal Procedure provides,

> Art. 28.10. Amendment of indictment or information
>
> (a) After notice to the defendant, a matter of form or substance in an indictment or information may be amended at any time before the date the trial on the merits commences. On the request of the defendant, the court shall allow the defendant not less than 10 days, or a shorter period if requested by the defendant, to respond to the amended indictment or information.

> (b) A matter of form or substance in an indictment or information may also be amended after the trial on the merits commences *if the defendant does not object.*
>
> (c) An indictment or information may not be amended over the defendant's objection as to form or substance if the amended indictment or information charges the defendant with an additional or different offense or if the substantial rights of the defendant are prejudiced.

TEX.CODE CRIM. PROC. ANN. art. 28.10 (Vernon 2006) (emphasis added).

conviction to stand. *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998). To determine whether the trial court's error affected a substantial right, we examine the possible outcomes had the indictment not been erroneously amended. The critical inquiry requires consideration of whether the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and whether prosecution under the original indictment would subject the defendant to the risk of being prosecuted later for the same crime. *Gollihar v. State,* 46 S.W.3d 243, 248 (Tex.Crim.App.2001) (quoting *United States v. Sprick,* 233 F.3d 845, 853 (5th Cir.2000)).

Appellant asserts that his substantial rights were prejudiced because the trial court allowed the State to correct a void indictment denying him the right to proceed to trial on the indictment returned by a grand jury. As we note above, the indictment here was not void. *See* TEX. PEN. CODE ANN. § 19.02(b)(1); *Fuller,* 73 S.W.3d at 253; *Rodriguez,* 137 S.W.3d at 761. The indictment originally charged that appellant "intentionally and knowingly cause[d] the death of an individual, by a manner and means unknown to the grand jury." The amendment added the complainant's name, Maria Barrientos, after the word "individual" to state that appellant "intentionally and knowingly cause[d] the death of an individual, Maria Barrientos, by a manner and means unknown to the grand jury." The amended indictment that includes Maria's name charges the same statutory offense as was charged in the original indictment. *See* TEX. PEN. CODE ANN. § 19.02(b)(1); *see Flowers v. State,* 815 S.W.2d 724, 728–29 (Tex.Crim. App.2001). Further, paragraph A of the indictment charged appellant with the same crime, murder, and specifically named Maria. Paragraph A states that appellant did "intentionally and knowingly

cause the death of an individual, MARIA BARRIENTOS, by CHOKING HER." The second paragraph, paragraph B, which is the subject of appellant's complaint here, followed the first paragraph, paragraph A, by also charging that appellant did "intentionally and knowingly cause the death of an individual." We cannot conclude that appellant's "substantial rights" were prejudiced by the failure to specifically name Maria in the second paragraph when the first paragraph of the same indictment charges the same offense with different manner and means of committing the offense. We note further that the trial court offered to give appellant an additional ten days to prepare for trial, but appellant opted not to accept the court's offer. *See* TEX.CODE CRIM. PROC. ANN. art. 28.10(a). We cannot conclude that appellant's substantial rights were prejudiced under these circumstances.

We hold that the trial court erred by allowing the State to amend the indictment on the day of trial, but that the error was harmless because the first paragraph of the indictment charged the same offense with a different manner and means against the same person.

We overrule appellant's second issue.

### The Audio–Taped Statement

In his third issue, appellant contends that the trial court erred by admitting the audio-taped statement that he gave to Sergeant Muniz, which he claims was a result of custodial interrogation and was inadmissible because it failed to comply with article 38.22 of the Code of Criminal Procedure.

### A. Motion to Suppress Standard of Review

 In reviewing the trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review. *Carmouche v. State,* 10 S.W.3d 323, 327

(Tex.Crim.App.2000); *Blake v. State*, 125 S.W.3d 717, 722 (Tex.App.-Houston [1st Dist.] 2003, no pet.). We give almost total deference to the trial court's determination of historical facts that depend on credibility, while we conduct a de novo review of the trial court's application of the law to those facts. *Carmouche*, 10 S.W.3d at 327. If, after a hearing on a motion to suppress, the trial court does not file findings of fact, as here, we view the evidence in the light most favorable to the trial court's determination and we assume that the trial court made implicit findings of fact in support of its determination if those findings are supported by the record. *State v. Gray*, 158 S.W.3d 465, 467 (Tex.Crim.App.2005) (quoting *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex.Crim.App.2000)). We will uphold the determination by the trial court if it is correct on any theory of law applicable to the case. *Id.*

### B. Article 38.22

The Code of Criminal Procedure provides requirements that must be followed for a custodial statement to be admitted in evidence at trial. *See* Tex.Code Crim. Proc. Ann. art. 38.22, § 3(a); *Woods v. State*, 152 S.W.3d 105, 116 (Tex.Crim.App. 2004). However, the restrictions in the Code of Criminal Procedure apply only to statements "made as a result of custodial interrogation." *See* Tex.Code Crim. Proc. Ann. art. 38.22, § 3(a); *Woods*, 152 S.W.3d at 116.[7] Thus, appellant's statement is admissible even if it does not comply with the conditions in the Code of Criminal Procedure if appellant was not in custody when it was made. *See* Tex.Code Crim. Proc. Ann. art. 38.22, § 3(a); *Woods*, 152 S.W.3d at 116.

 The central dispute here concerns whether appellant was in custody when he made the audio taped statement. "A person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931

---

7. Section 3(a) of article 38.22 provides,
 No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
 (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;
 (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;
 (3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;
 (4) all voices on the recording are identified; and
 (5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

Tex.Code Crim. Proc. Ann. art. 38.22, § 3(a). The accused must be informed of the following rights under section 2(a):
(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
(2) any statement he makes may be used as evidence against him in court;
(3) he has the right to have a lawyer present to advise him prior to and during any questioning;
(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
(5) he has the right to terminate the interview at any time.
*Id.* § 2(a). For a statement to be admissible, strict compliance with section 3(a) is required. *Woods v. State*, 152 S.W.3d 105, 116 (Tex.Crim.App.2004).

S.W.2d 244, 254 (Tex.Crim.App.1996). The reasonable person standard presupposes an innocent person. *Id.* The subjective intent of law enforcement officials to arrest is irrelevant, unless that intent is somehow communicated or otherwise manifested to the suspect. *Id.*

"The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances." *Id.* at 255. Stationhouse questioning does not, in itself, constitute custody. *Id.* However, the mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into a custodial interrogation. *Id.*

There are four general situations that may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Id.* Concerning the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* The first through the third situations are not presented here. The sole question before us is whether, during the encounter with appellant when he gave his statement at the police station, probable cause to arrest appellant developed during the course of the encounter, which is the fourth situation. *Id.*

Concerning the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect; such manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. *Id.* Moreover, the fourth situation does not automatically establish custody. *Id.* Rather, custody is established in the fourth situation if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.* In *Dowthitt*, the Court of Criminal Appeals held that "custody" began when Dowthitt admitted to his presence during the murders because "a reasonable person would have realized the incriminating nature of the admission," and other factors were present that "involv[ed] the exercise of police control" over him. *Id.* at 257. These other factors included a lengthy interrogation lasting over 12 hours from the time he first appeared at the police station to the time he made the incriminating statement, police officers accompanying him to the restroom, and police officers ignoring his requests to see his wife. *Id.*

The United States Supreme Court addressed the question of "custody" in the context of a stationhouse interrogation in *Beheler* and *Mathiason*. *California v. Beheler*, 463 U.S. 1121, 1124–25, 103 S.Ct. 3517, 3519–20, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). In *Beheler*, the suspect voluntarily accompanied the police to the station, talked for less than 30 minutes, and was permitted to return home. 463 U.S. at 1122, 103 S.Ct. at 3518. The Court held that this interview was not custodial. *Id.* at 1125, 103 S.Ct. at 3520. In *Mathiason*, the suspect came voluntarily to the police station, was immediately informed that he was not under arrest, participated in a 30–minute interview, and left the police station without

hindrance. 429 U.S. at 493–94, 97 S.Ct. at 713. The Court likewise held that interview to be non-custodial. *Id.* at 495, 97 S.Ct. at 714; *see also Meek v. State,* 790 S.W.2d 618, 622 (Tex.Crim.App.1990) (finding no custody when suspect came to station voluntarily at time of his own choosing, was allowed to step outside building and go unaccompanied to his car during interviews, and "a few hours" later was allowed to leave unhindered after statements were completed); *Turner v. State,* 685 S.W.2d 38, 41–43 (Tex.Crim.App.1985) (finding no custody when witness who was not suspect was contacted by police, voluntarily went to police station to make a statement, and was immediately read warnings when he made statement that caused police to suspect him); *Dancy v. State,* 728 S.W.2d 772, 777–79 (Tex.Crim. App.1987) (finding no custody when suspect voluntarily came with police to station, voluntarily answered questions, gave hair samples, allowed police to take his shoes to run print comparisons, and was arrested at conclusion of 38–minute interview).

■ Although a statement made by a person is sufficient to establish probable cause, the statement is not custodial if the court determines based on other factors that the person was not under arrest. *Garcia v. State,* 106 S.W.3d 854, 858–59 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd). Garcia, the defendant, was not in custody when he voluntarily went to the police department, and after he was told that he could leave, he voluntarily gave a videotaped statement. *Id.* at 858. Garcia made an admission establishing probable cause during his statement, which took 30 minutes. *Id.* at 858–598. We held that, although his statement was sufficient to establish probable cause, other factors showed that Garcia was not under arrest. *Id.* Only two officers were with Garcia, and

neither was armed. *Id.* at 858. After the statement, Garcia was taken to a visitor's room where he was left, unguarded, with his girlfriend. *Id.* at 859. Nothing prevented Garcia from simply leaving the police department. *Id.* We held that "a reasonable person in [Garcia's] position would not believe that he was restrained to the degree associated with a formal arrest." *Id.*

At the hearing on the motion to suppress, Sergeant Muniz, Detective White, and appellant testified. The testimony of Sergeant Muniz and Detective White shows that on the afternoon of November 7, 2001, Sergeant Muniz, Detective White, and other officers went to appellant's apartment. When the officers arrived at the apartment, they found small children there, unaccompanied by adults. After a short while, appellant arrived at the apartment. Detective White, who had been assigned to Maria's case since 1994, knew appellant and introduced Sergeant Muniz. Sergeant Muniz acknowledged that he "probably could have told" appellant something to the effect that the children could be taken away if they were being left abandoned. However, Sergeant Muniz denied making any threat to call CPS about the unattended children at the apartment or making any threats concerning appellant's children.

Sergeant Muniz was in plain clothes with his police identification displayed. Detective White told appellant that they would like to speak with him. Detective White told appellant that they just wanted to talk to him about Maria's "missing person case." Appellant agreed to go to the Sugar Land Police Department to give an interview. Appellant's mother remained at the apartment with the children.

Because he did not have a car to drive, appellant rode with Sergeant Muniz in an unmarked pickup truck, where they made

small talk on the way to the police station. Appellant rode in the front seat of the truck, without any handcuffs. On the drive to the police station, appellant's wife was called to let her know that appellant was at the police station. She also agreed to come to the police station after work that day to give a statement.

At around 5:00 p.m., they arrived at the Sugarland Police Department, which was undergoing remodeling, and entered a small office in a portable building. Sergeant Muniz explained that when he began speaking with appellant, appellant was not in custody and was free to leave. Only Sergeant Muniz and appellant were present during the interview. Sergeant Muniz explained that he never threatened appellant "with anything," did not make any promises to him, and that appellant voluntarily agreed to give a statement. Sergeant Muniz read appellant the warnings set out in article 38.22 of the Code of Criminal Procedure, even though Muniz believed that was not required because appellant was not in custody. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a). Appellant waived his rights and agreed to talk to the Sergeant, who interviewed appellant for about 15 or 20 minutes. Appellant quickly admitted to being involved with Maria's death. Appellant told Sergeant Muniz that he wanted to give a statement because he had "a premonition that Ms. Barrientos' ghost came and visited him one night and said two men wanted to come talk to him, and he wanted to get it off his chest, he wanted to come through with the truth."

After this, Sergeant Muniz began recording appellant's statement. The recording began at 5:38 and ended at 5:58. On the tape, appellant acknowledged that he had been read "*Miranda* warnings." When the interview finished, appellant asked Sergeant Muniz if he was going to

be arrested. Sergeant Muniz told him "not yet, not at that time." After the taped interview, appellant sat in the lobby of the building that had the front door wide open, where he sat by himself, before his wife came to the station in her car. Sergeant Muniz said that appellant did not ask for an attorney. Sergeant Muniz did offer to get appellant some cigarettes.

Appellant's testimony was considerably different from the police officers' testimony. Appellant said that Sergeant Muniz told him "you have to come with me" to the Police Department. Appellant claims that Sergeant Muniz told him that if he did not come to the Department, he could lose his kids because Sergeant Muniz would call Child Protective Services to tell them that appellant had abandoned his children. Appellant testified that he asked Sergeant Muniz if he needed a lawyer, but was told that he did not need one because "[w]e're just going to be chatting." Claiming that he did not understand the rights Sergeant Muniz read to him, appellant related that he spoke to the police officers due to his worry that he might lose his children.

After the hearing, the trial court ruled that the statements to Sergeant Muniz and Detective White were admissible because the "statements were not the result of custodial interrogation." The trial court did not file findings of fact regarding its rulings. Appellant contends that he was in custody at the point that he admitted to Sergeant Muniz his role in Maria's death, and that Sergeant Muniz considered appellant a suspect and did not tell appellant that he was free to leave. We conclude that appellant's statements made during the initial interview by Sergeant Muniz that acknowledged his involvement in the murder of Maria provided sufficient probable cause to arrest him. *See Dowthitt*, 931 S.W.2d at 257. However, we conclude that the other circumstances present, when

viewed in a light most favorable to the trial court's ruling, are sufficient to show that he was not in custody. Although appellant rode with a police officer to the station, the record shows that the police car was an unmarked vehicle and that appellant chose to ride with the officer because he did not have a car. The record also shows that although appellant's rights were not read to him while the audio tape was recording his statement, appellant acknowledged that he had previously been read his "*Miranda* warnings" and Sergeant Muniz testified that appellant waived his rights. The record also shows that appellant's interview was short in length, lasting only 15 or 20 minutes, from the time he got to the police station to the time he made the admissions about his involvement in the murder. Additionally, appellant was only interviewed by one police officer, who was in plain clothes, and in an office-like setting. Further, appellant was not threatened in any way, was not promised anything, and voluntarily made the statement, according to the Sergeant. Appellant was told that he was not under arrest after he made the statement to Sergeant Muniz, and he sat in a lobby with an open front door.

█ The facts here are unlike the lengthy 12–hour period involved in *Dowthitt*, which included other circumstances that showed that Dowthitt was in custody. *See Dowthitt*, 931 S.W.2d at 256. Instead, the situation here is more like *Garcia*, which held that Garcia was not in custody, despite his statements that gave the officers probable cause to arrest him. *See Garcia*, 106 S.W.3d at 858–59. We hold that although appellant's statements were sufficient to establish probable cause to arrest him, the other circumstances present would not "lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *See*

*Dowthitt*, 931 S.W.2d at 254; *Garcia*, 106 S.W.3d at 859. We further hold that because the statement was not made while appellant was in custody, it did not need to comply with article 38.22 of the Code of Criminal Procedure, and thus the trial court did not err by admitting the statement. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(a); *Woods*, 152 S.W.3d at 116.

We overrule appellant's third issue.

### Subsequent Statements to Police Officers

█ In his fourth issue, appellant asserts that his subsequent statements made after the audio-taped statement to Sergeant Muniz were inadmissible as "fruits of the poisonous tree" and should not have been admitted.

After Sergeant Muniz recorded appellant's statement, he told Detective White that appellant had confessed. Within a short time, perhaps five minutes, Detective White sat down with appellant, interviewing him and preparing a written statement. This interview took from 30 minutes to an hour. At the end of this time, appellant signed the written statement, which had been typed by Detective White.

Immediately after signing the statement, appellant left with other officers to show them where he and his wife had dumped Maria's body. He was gone for approximately four hours. He arrived back at the police department around 1:00 a.m. Appellant gave an additional statement to Detective White that was recorded with an audio tape.

After the second statement, Detective White asked appellant to return late in the morning or in the early afternoon of that same day, November 8, 2001. Appellant voluntarily returned and gave a third statement to Detective White beginning at

1:06 p.m. This third statement was also recorded by audio tape.

██ An appellant waives a ground for appeal if that point is not raised before the trial court. *See Martinez v. State*, 17 S.W.3d 677, 682–83 (Tex.Crim.App.2000) (citing Tex.R.App. P. 33.1). To preserve a complaint for appeal, the objection at trial must conform with the grounds asserted in the appeal. *See id.; Wade v. State*, 164 S.W.3d 788, 792–93 (Tex.App.-Houston [14th Dist.] 2005, no pet).

Here, appellant's written motion to suppress and his arguments to the trial court concerning the motion to suppress are premised on the contention that he was not properly informed of his rights before the statements were made and that he was in custody when the statements were made. On appeal, appellant contends for the first time that the statements to Detective White "were 'the product of the fruits of the poisonous tree' of SGT. MUNIZ'S prior acts." Appellant urges this Court to apply the four-factor "attenuation of the taint" analysis of *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Because this basis for the objection to the three statements given to Detective White was not raised before the trial court, appellant has not preserved this complaint for appeal. *See Martinez*, 17 S.W.3d at 683. We hold that appellant waived his complaint about the subsequent statements given to Detective White. *See Martinez*, 17 S.W.3d at 682–83; *Wade*, 164 S.W.3d at 792–93.[8]

We overrule appellant's fourth issue.

**8.** We also note that we have previously held that the trial court did not err by admitting the audio-taped statement given to Sergeant Muniz.

**9.** Factors that could affect a trial court's determination of reliability include, but are not limited to, the following: (1) the extent to which the underlying scientific theory and

## Reliability of Expert Testimony Regarding Cadaver Dogs

██ In his fifth issue, appellant asserts that the trial court erred by admitting testimony that the cadaver dogs alerted on the scent of human remains because the evidence was not shown to be reliable.

### A. Standard of Review and Rules for Determination of Reliability

██ A trial court's decision to admit or exclude scientific testimony is reviewed for an abuse of discretion and a reviewing court will uphold the decision if it is within the zone of reasonable disagreement. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex.Crim. App.2002). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.Crim. App.1990).

██ Rule 702 of the Texas Rules of Evidence allows a qualified expert to provide evidence about a subject that requires specialized knowledge. Tex.R. Evid. 702. In assessing admissibility under Rule 702, the trial court must "determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results." *Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim.App.1992). In *Kelly*, the Court of Criminal Appeals set forth a three-prong reliability test and identified seven non-exclusive factors for courts to consider in assessing reliability of scientific evidence.[9] *Id.* at 573; *see also*

technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with

*Winston v. State*, 78 S.W.3d 522, 526 (Tex. App.-Houston [14th Dist.] 2002, pet. ref'd). Appellant suggests that the *Kelly* factors should be applied here.

■ However, when the expert evidence concerns "areas of soft science and non-traditional sources of expert testimony," the Court of Criminal Appeals has adopted an "appropriately tailored translation of the *Kelly* test." *State v. Medrano*, 127 S.W.3d 781, 785 (Tex.Crim.App.2004) (citing *Nenno v. State*, 970 S.W.2d 549, 561(Tex.Crim.App.1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex.Crim.App.1999)). In *Nenno*, the Court stated that when addressing fields that are based upon experience or training as opposed to scientific methods, the appropriate questions for assessing reliability are (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of the field, and (3) whether the expert's testimony properly relies upon or utilizes the principles involved in the field.

970 S.W.2d at 561. We agree with the Fourteenth Court of Appeals's determination that the reliability of expert testimony that describes a dog's alert to a scent is determined by using the *Nenno* criteria. *See Winston*, 78 S.W.3d at 526 ("Since interpretation of a dog's reaction to a scent lineup is based upon training and experience, and not scientific method, we apply the less rigorous *Nenno* test in this case.").[10]

**B. Reliance Upon or Utilization of Principles in the Field**

Here, appellant has not challenged the first two prongs of *Nenno* that ask whether the field of expertise is a legitimate one and whether the subject matter of the expert's testimony is within the scope of that field. *See Nenno*, 970 S.W.2d at 561. Appellant's challenge concerns only the third prong that asks whether the expert's testimony properly relies upon or utilizes the principles involved in the field of expertise. *See id.*

which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App.1992).

10. One other jurisdiction has held that evidence regarding alerts by cadaver dogs at a site at which a murder victim's body had once been buried met criteria for admissibility of scientific evidence. *Clark v. State*, 140 Md. App. 540, 781 A.2d 913, 936 (Md.Ct. Spec.App.2001). Clark was convicted of the second degree murder of a six-year old child whose body had not been found. *Id.* at 918. Nearly seven years after the child's disappearance, a cadaver dog was used to search a cemetery based largely on a map found in Clark's truck. *Id.* at 920–21. Dan, the cadaver dog used at the cemetery, indicated an alert in the area of a soil disturbance, which was near a headstone marked "Clark." *Id.* at 921. A second cadaver dog alerted at the same spot two and one-half years after Dan's

initial alert, approximately nine years after the child's disappearance. *Id.* at 935. However, no body was found. *Id.* During a pretrial motion in limine, an expert in the field of forensic anthropology and the identification of human remains explained, "In light of modern embalming and burial practices, she believed a properly trained cadaver dog would be able to distinguish a legitimate grave from a clandestine one within a cemetery because during embalming all body fluids are drained from the corpse, whereas persons who bury corpses in clandestine graves usually do not remove body fluids." *Id.* at 932–33. The *Clark* court held that because the Clark plot had been disturbed, appellant was present with his truck and shovel at the grave site, a second cadaver dog alerted at the same spot, and the spot where the cadaver dogs alerted matched the spot marked by an asterisk found on a map in appellant's truck, there was adequate foundation for the admission of the testimony regarding the officers' interpretations of the cadaver dogs' actions. *Id.* at 577–78, 781 A.2d 913.

The Court of Criminal Appeals has not established criteria for determining whether the expert's testimony concerning cadaver dogs properly relies upon or utilizes the principles involved in the field. We, however, have applied three factors for determining reliability of expert testimony concerning dogs that alert to the scent of humans. *Risher v. State*, No. 01–05–00960–CR, 2006 WL 3518145, at \*2, 227 S.W.3d 133, 136–37 (Tex.App.-Houston [1st Dist.] 2006, pet. filed) (applying three factors to determine whether third prong of *Nenno* is met in human-scent lineup evidence of convicted drug dealer); *see also Winston*, 78 S.W.3d at 527 (analyzing third prong of *Nenno* utilizing three-factor approach to determine admissibility of human-scent lineup evidence in burglary case). As here, the dogs in *Risher* and *Winston* alerted to human scents. *See Risher*, 2006 WL 3518145, at \*3, 227 S.W.3d at 137; *Winston*, 78 S.W.3d at 527. However, the dog in *Risher* involved a human-scent lineup and the dog in *Winston* identified a burglary suspect based on human-scent left at the scene. Although *Risher* and *Winston* did not involve cadaver dogs, we conclude that the factors used by our Court in *Risher* and by the Fourteenth Court of Appeals in *Winston* are equally applicable to cadaver dogs. *See Risher*, 2006 WL 3518145, at \*2, 227 S.W.3d at 136–37; *Winston*, 78 S.W.3d at 527.

■ To determine whether the testimony describing the alerts by the cadaver dogs meets the third prong in *Nenno*, we must examine the (1) the qualifications of the particular trainer, (2) the qualifications of the particular dog, and (3) the objectivity of the particular cadaver search. *See Risher*, 2006 WL 3518145, at \*2, 227 S.W.3d at 136–37 (recognizing foundation for dog's reliability for human-scent lineup by examining qualifications of particular

trainer; qualifications of particular dog; and objectivity of particular lineup).

### 1. Qualifications of Trainers

The two dogs, Missy and Chloe, each had trainers, and, in addition, Deputy Pickett testified about his role in training these dogs. We address each of their qualifications. *See Risher*, 2006 WL 3518145, at \*2–3, 227 S.W.3d at 136–37.

■ Missy, the dog that made the initial alert in this case was trained by Ja' Na Bickel, the owner, and Deputy Pikett, a trainer. Bickel testified that after she retired from a previous job she founded "Special Canines," an organization that assists law enforcement agencies and families to find bodily remains. She also testified that she has conducted cadaver searches since 1994. Bickel has two dogs that she trains in cadaver searching, Missy and a young Catahoula. Bickel has received canine training from Deputy Pikett as well as other experts at seminars.

■ Chloe is the dog that independently confirmed the scent initially detected by Missy. Ann Spurlock, Chloe's owner and co-trainer, testified that her work with dogs began as a professional dog obedience trainer. Spurlock initially became involved in searches as an assistant to other dog handlers. She started training Chloe in tracking and trailing, but moved into cadaver work when Chloe showed a natural propensity to want to find and search in a more free-form manner.

■ Deputy Pikett, who has a Bachelor of Science degree and a Master of Science degree in Chemistry, both from the University of Southern Alabama, trained Missy and Chloe, the dogs used in this case. He began his canine training in 1989 by "old timers" with forty to fifty years experience. Pikett has attended over 176 hours of dog training seminars including some hands on training conduct-

ed by experts in the field. Deputy Pikett's canine work began with trailing people and progressed to cadaver work. He has written articles for the *National Bloodhound Bulletin* and the *South Central Bloodhound Newspaper* and has lectured for the Sugar Land Police Department as well as for the FBI on several occasions. Deputy Pikett has trained dogs for the cities of Galveston, Houston, Dallas, Bellaire, and the Texas Parks and Wildlife Department. In 1997, the FBI approached Deputy Pikett to search for missing people. Deputy Pikett testified that experts in the community have observed his dog training technique and expressed approval. Additionally, Deputy Pikett has testified as an expert in canine training in other cases and his testimony has never been excluded. *See e.g. Winston*, 78 S.W.3d at 527 (holding that testimony from Deputy Pikett describing dog's alert in scent lineup admissible). We conclude that the trainers were qualified to handle Missy and Chloe, the cadaver dogs used in this case.

## 2. Qualifications of Dogs

We must next examine the qualifications of the dogs, Missy and Chloe. In determining whether a dog used in a scent lineup was qualified, we have applied five factors. *Risher*, 2006 WL 3518145, at *3, 227 S.W.3d at 137 (citing *Winston*, 78 S.W.3d at 527–28). In *Risher*, we held that a scent-lineup dog is qualified if "it (1) is of a breed characterized by acuteness of scent and power of discrimination, (2) has been trained to discriminate between human beings by their scent, (3) has been found by experience to be reliable, (4) was given a scent known to be that of the alleged participant of the crime, and (5) was given the scent within the period of its efficiency." *Id.* (applying five factors to assess reliability of dog in human scent lineup). The Fourteenth Court of Appeals applied these same five factors in *Winston*

to determine the reliability of a dog that tracked a burglary suspect based on human scent left at the crime scene. *Winston*, 78 S.W.3d at 527–28. We must determine whether these five factors are equally applicable to searches by cadaver dogs.

Searches by cadaver dogs are different from searches by dogs for scents left by live humans. Deputy Pikett testified that cadaver searching is a less rigorous skill because it only requires the dog to be able to distinguish between human scents and animal scents, and the dog need not further distinguish between individual humans. As we explain below, because the skills necessary for a cadaver dog differs from the skills necessary for scent lineups or the tracking of suspects, we conclude that only some of the five factors in *Risher* apply to searches by cadaver dogs. *See Risher*, 2006 WL 3518145, at *4, 227 S.W.3d at 137–38.

### a. Breed Characterized by Acuteness of Scent

Deputy Pikett testified that all dogs have a more acute sense of smell than humans and that bloodhounds have an olfactory sense that is 26 times that of a human. Deputy Pikett explained that because a cadaver dog need not distinguish between the scents of different individuals and need only distinguish between the scent of human and animal remains, a breed such as a bloodhound that is traditionally known for its acuteness of scent is not necessary to use as a cadaver dog. Deputy Pikett further explained that a bloodhound is typically not a good cadaver search dog because bloodhounds are "not great obedience dogs" and typically must be worked on a lead, or leash. Deputy Pikett testified that in a large area search, a dog that can work off-lead is more credible because it is free to make an indepen-

dent find, without the possibility that its handler will lead it to a particular area. Deputy Pikett said that other breeds, "such as Rottweilers mixed-breeds, Lab[radors] and so forth" can perform as cadaver dogs. We conclude that the breed of dog characterized by acuteness of scent is not determinative of a cadaver dog's qualification. However, we slightly modify this factor to examine whether the dog type or breed typically works well off-lead.

### b. Trained to Discriminate Between Human Beings by Scent

Cadaver dogs are not trained to discriminate between human beings based on scent because the identity of the body being searched for is generally not in dispute. Deputy Pikett explained that the important distinction for a cadaver dog to master is between human remains and animal remains. The training begins with fairly fresh cadaver scent in a relatively easy location. The dogs progress to older body scents and then to the introduction of foreign scent distractions such as deer, horse, or cow bones. We conclude that this requirement must be adapted slightly for determination of the reliability of cadaver dogs by examining whether the dog has been trained to discriminate between human cadaver scents and animal scents.

### c. Found by Experience to Be Reliable

Proven reliability must be a qualifying characteristic of a cadaver dog, just like the need for proven reliability of dogs used in scent-lineups and the tracking of suspects. Deputy Pikett testified that a dog that cannot pass the training tests—for example, by failing to distinguish human and animal remains—will be retired from cadaver search work. To ensure that the dog can distinguish human and animal scents, Deputy Pikett explained that a dog in training must first prove that it can actually find a human scent, and then the

training progresses to older scents, followed by the introduction of foreign scents. We therefore conclude that this factor is applicable to the qualifications and reliability of a cadaver dog.

### d. Given the Scent of the Participant of Crime

As explained above, the use of a cadaver dog is not for identification of a particular person by that person's scent. The cadaver dog searches only for the scent of human remains and is not used to track or identify a particular person's scent. We therefore conclude that this factor does not apply to the qualifications of a cadaver dog.

### e. Given Scent Within the Period of Efficiency

Unlike scent-lineups, cadaver searches are typically performed substantially after the crime has been committed. Deputy Pikett testified that a dog trained to find human remains can detect the scent remaining in the soil from a decomposing body, even though physical remains are no longer present. Likewise, Deputy Pikett testified that when a body has lain on the ground and decomposed, a dog can pick up the smell of the water, the blood, and the disintegrating organs that have seeped into the soil. We therefore conclude that this element is not relevant in the context of cadaver searching because the immediacy of the search is not indicative of the efficiency of the scent.

Having examined the five factors in *Risher* and *Winston*, we have determined that those factors must be adapted slightly to meet the unique function of a cadaver dog—to detect deteriorating human remains. We conclude that the factors we must examine to determine a cadaver dog's qualifications and reliability are whether the dog (1) is a breed or type

that typically works well off-lead, (2) has been trained to discriminate between human scents and animal scents, and (3) has been found by experience to be reliable. *See Risher*, 2006 WL 3518145, at *4, 227 S.W.3d at 137–38. These factors are not exclusive. Other factors may be considered in an appropriate case.

### f. Application of the Adapted Factors

 We apply the three factors described above to determine whether Missy and Chloe were qualified cadaver dogs. The first factor is whether the type or breed of dog works well off-lead. Missy is a mixed-breed dog, a Sharpei-shepherd mix. Chloe is a Rottweiler. Deputy Pikett testified that mixed-breed dogs and Rottweilers are capable of performing as cadaver dogs, and that cadaver dogs are dogs that work well off-lead. Although his testimony does not directly show that these dogs work well off-lead, his testimony reasonably supports the inference. Thus, the first factor weighs slightly in favor of the implied finding that Missy and Chloe were qualified and reliable.

The second factor concerns the training of the dog to distinguish between human cadaver scents and animal scents. Before the search in 2001, Bickel and her dog Missy had been to at least 10 different training seminars in addition to training several times a week. Deputy Pikett testified that he had trained extensively with Missy and she is a very good dog. In 2000, Missy was certified by two local organizations and two national organizations, including the North American Search Dog Network and the Lone Star Search and Rescue Dog Association.

Spurlock testified that she and Chloe, the confirmatory dog, had received training at various seminars from dog trainers and from law enforcement personnel and that Chloe exhibited a meticulous attitude towards cadaver work. In November 2001, Chloe had received extensive training for one and one-half years, was certified within the volunteer group of which she and Spurlock were a part, but was not certified by any national organization. The local certifications were done by an outside evaluator that utilized the same standards as the national organizations. Only dogs who meet the standards will be used for a cadaver search. The State's witnesses established that these cadaver dogs had received training and were certified to be used in searches. The second factor weighs in favor of the implied finding that the dogs were qualified to conduct the cadaver search.

The third factor is whether the dog has been shown to be reliable in its prior experiences searching for cadavers. Bickel testified that as of November 9, 2001, Missy already had a good history of finding human remains. After receiving her certification, Bickel testified that she had never known Missy to indicate a false positive, such as alerting on animal remains. Spurlock testified that in Chloe's training she performed very well when distractions such as animal bones or fluids were put out in the field and was still able to find the human remains. Spurlock testified that she had tested Chloe using many different scenarios such as various fluid samples from the morgue and items buried as deep as five feet. Spurlock also testified that she and Chloe had conducted "numerous searches for remains" and that this case was the first time she had been called to court to testify about a cadaver search. Spurlock testified that during her training and searches, Chloe had never given an alert that was later proved false. Deputy Pikett similarly testified that based upon his training and dealing with Missy and Chloe, they were reliable each time he used them. The witnesses testified that a

dog that could not consistently show its reliability in training was not used for actual searches. The witnesses' testimony established that Missy and Chloe had never falsely indicated human remains and that Missy and Chloe could consistently distinguish human remains from other scents. The third factor weighs in favor of the implied finding that the dogs were qualified.

The three factors, when applied to Missy and Chloe, support the trial court's implied finding that the dogs were qualified to search for cadavers. We conclude that the record supports the trial court's implied finding that the dogs were qualified to conduct the search for the cadaver.

### 3. Method of Search

The third factor under the third prong of *Nenno* requires that we examine the objectivity of the particular search, which here is the manner that the search for the cadaver was conducted. *See Risher*, 2006 WL 3518145, at *4, 227 S.W.3d at 137–38. Deputy Pikett testified that he observed both dog and handler teams used in this case during their searches for Maria's body on November 9, 2001. He stated that both handlers used their dogs in the manner generally employed by cadaver dog teams. Bickel and Spurlock also testified that their dogs followed the practices and procedures that are generally used in searches by cadaver dogs. The two dogs worked independently of one another, so that they would not influence each other. Bickel testified that Missy performed a grid search on three areas on the property, but only alerted on one. Spurlock testified that there were no outside influences on Chloe's search that would have caused her to alert in a designated area. Accord-

ing to Spurlock, Chloe was simply positioned downwind on the property and instructed to start. Each dog performed its search independently from the handlers, working off-lead. Finally, the dogs alerted to the same location that appellant had indicated Maria's body had been placed. We conclude that the record shows that the search for the cadaver was conducted objectively, using practices and procedures that are generally used in searches by cadaver dogs.

We hold that the proper foundation was established as required by the *Nenno* test and that the trial court did not abuse its discretion in determining that the evidence regarding the cadaver dogs was reliable and admissible. *See Winston*, 78 S.W.3d at 522.

We overrule appellant's fifth issue.

### Whether Expert Testimony About Cadaver Dogs Is Unfairly Prejudicial

In his sixth issue, appellant asserts that the trial court erred by admitting testimony that the cadaver dogs alerted on the scent of human remains because the evidence was more prejudicial than probative under Rule 403 of the rules of evidence. *See* Tex.R. Evid. 403. Appellant asserts that the evidence has little probative value because no human remains were found and, thus, the dogs could have been mistaken. Appellant further asserts that because Deputy Pikett, Bickel, and Spurlock all admitted on cross-examination that even if the dogs alerted to the scent of human remains, there were a "myriad of other explanations" for how the scent of remains got to the location identified by the dogs.[11]

---

11. Appellant specifically identifies several "other explanations" in his brief—"wild animals could have brought the body parts on

the land ... or [] floods, leaks or the fill dirt from another location could cause the scent." These "other explanations" were used to

A trial court's decision to admit or exclude testimony is reviewed for an abuse of discretion. *See Sexton,* 93 S.W.3d at 99. Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." TEX.R. EVID. 403. The Court of Criminal appeals has identified a non-exclusive list of factors to apply in making a rule 403 analysis. *Reese v. State,* 33 S.W.3d 238, 240–41 (Tex.Crim. App.2000). These factors include, but are not limited to,

(1) how probative the evidence is;
(2) the potential of the evidence to impress the jury in an irrational but indelible way;
(3) the time the proponent needs to develop the evidence; and
(4) the proponent's need for the evidence.

*Id.* A trial court's ruling on a rule 403 objection is reviewed for an abuse of discretion. *Id.* at 241.

Under the first factor, we note that the evidence of the cadaver dogs is probative. Two dogs independently indicated that they detected the scent of human remains in the same spot that appellant stated that he had dumped Maria's body. The second factor requires that we examine the potential of the evidence to impress the jury in an irrational but indelible way. The evidence from the cadaver dog's alert on the scent of human remains at the location where appellant states that he dumped Maria's body merely corroborates appellant's own statements. We cannot conclude that the evidence describing the alerts by the dogs would impress the jury

in an irrational and indelible way. The third factor concerns the time that the proponent needs to develop the evidence. The record does not clearly indicate the exact time required by the State to present the testimony of Deputy Pikett, Bickel, and Spurlock to the jury, however, it was less than half of one day of trial.[12] The fourth factor also supports the trial court's ruling to admit the evidence. The State needed the evidence to corroborate appellant's statements and to show that Maria was dead because her body was never recovered. Thus, under the factors identified in *Reese,* we conclude that the trial court did not abuse its discretion in finding that the dangers of unfair prejudice, confusion of the issues, or misleading the jury did not "substantially outweigh" the probative value of the evidence regarding the cadaver dogs.

Appellant cites *Wiley v. State,* 74 S.W.3d 399 (Tex.Crim.App.2002) in support of his contention that the evidence regarding the cadaver dogs would confuse the issues or mislead the jury. Appellant quotes the following footnote:

The danger of "confusion of the issues" and "misleading the jury" arises when circumstantial evidence tends to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue in the current case. The classic explanation of this danger comes from Dean Wigmore: "The notion here is that, in attempting to dispute or explain away the evidence thus offered, new issues will arise as to the occurrence of the instances and the similarity of conditions, [and] new witnesses will be needed whose cross examination and

cross-examine Deputy Pikett, Bickel, and Spurlock.

12. The examination of Deputy Pikett began approximately 10:45 a.m. and all three witnesses had finished their testimony before the trial court excused the jury for the day's lunch break.

impeachment may lead to further issues." 2 John H. Wigmore, Evidence § 443, at 528–29 (Chadbourn rev.1979). In short, the evidence is a "rabbit trail." *Wiley*, 74 S.W.3d at 407 n. 21. In *Wiley*, the appellant, who was charged with arson, wanted to introduce evidence that another person may have "assisted" an "alternate perpetrator" set the fire at issue. *Id.*, 74 S.W.3d at 406. However, this other person was an individual with a severely limited mental capacity and Wiley had testified to the grand jury that he did not believe the individual could have set the fire. *Id.* The court noted that there was no evidence that the individual was involved with the fire, only speculation that this was so. *Id.* at 407. Thus, if the trial court had allowed Wiley to present the evidence of the other individual, "it would have forced the State to attempt to disprove the nebulous allegation that perhaps [the other individual] was somehow involved as an assistant to some unknown sophisticated arsonist." *Id.* Such evidence would also have turned the jury away from deciding the only issue in the case— whether Wiley had set the fire—and speculate whether an individual who was not on trial may have been involved. *Id.* Here, the evidence was probative of whether appellant had disposed of Maria's body where he said that he did, and the evidence did not point to other suspects. Nor did it require the jury to speculate on an issue that it was not asked to decide in the case. *See id.* at 407. We hold that the trial court did not err by overruling appellant's rule 403 objection.

We overrule appellant's sixth issue.

### *Corpus Delicti*

Appellant's seventh issue challenges the trial court's refusal to instruct a verdict of not guilty due to lack of proof of the *corpus delicti*. Specifically, appellant asserts that the State failed to prove the commission of an offense because his uncorroborated statements alone are not sufficient to show that a crime was committed.

A criminal conviction cannot be based upon a defendant's extrajudicial confession unless the confession is corroborated by independent evidence tending to establish the *corpus delicti*. *Gonzales v. State*, 190 S.W.3d 125, 130 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd), *cert. denied*, *Gonzales v. Texas*, — U.S. —, 127 S.Ct. 504, 166 L.Ed.2d 377 (2006). Texas defines *corpus delicti* as harm brought about by the criminal conduct of some person. *Id.* at 130–31. Some evidence, independent of appellant's statements, must show that the crime actually occurred, though the independent evidence does not have to identify the defendant as the culprit. *Salazar v. State*, 86 S.W.3d 640, 644–45 (Tex.Crim.App.2002). The corroborating evidence need not prove the underlying offense conclusively; all that is required is that some evidence makes the commission of the offense more probable than it would be without the evidence. *Cardenas v. State*, 30 S.W.3d 384, 390 (Tex.Crim.App.2000); *Chiles v. State*, 988 S.W.2d 411, 414 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd).

In this case, there were several pieces of evidence that make it more probable than not that Maria was murdered. Maria disappeared suddenly in June 1994 without any explanation to her friends or family. Her bank account was abandoned with a hundred dollar balance, even though she did not have much money. Despite witness statements that she carried her bible with her everywhere, it was found at her home. Her daily prayer partner of eleven years has not heard or seen her since she disappeared. She had a job as a nanny that she never returned to after leaving

work the day she was last seen. Her car was found abandoned, unlocked, with her purse and keys undisturbed inside. Although she had previously visited family in Mexico, none of her relatives have seen or heard from her since May 1994. Further, appellant and his wife lived in Maria's home, but did not assist in searching for her after she disappeared. Tests revealed the possible presence of blood in the kitchen, hallway, and bathroom of Maria's home. This was consistent with the statement appellant gave to police that Maria had been murdered in the kitchen and her body moved to the bathroom. Appellant's car revealed the possible presence of blood in the back floorboard area. In addition, two cadaver dogs trained to detect the scent of human remains independently alerted at the same spot that appellant identified as the location where he disposed of Maria's body. We conclude that these combined circumstances are some evidence that makes the commission of the murder "more probable than it would be without the evidence." *Cardenas,* 30 S.W.3d at 390; *Chiles,* 988 S.W.2d at 414; *see also Fisher v. State,* 851 S.W.2d 298, 303 (Tex.Crim.App.1993) (finding sufficient corroborating evidence to prove *corpus delicti* where victim vanished suddenly, her personal affairs—such as friendships and her bank account—were unresolved, she did not have much money with which to leave town, and blood was found in victim's home). We hold that the trial court did not err by finding sufficient the proof of the *corpus delicti.*

We overrule appellant's seventh issue.

## Conclusion

We affirm the judgment of the trial court.