TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00325-CR






Matthew Allen Harris, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT

NO. 59543, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 A jury convicted Matthew Allen Harris of the offense of capital murder. See
Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2007). Punishment was assessed at life
imprisonment. In a single issue on appeal, Harris challenges the district court's denial of his motion
to suppress statements he made to law enforcement officers. We will affirm the judgment.


BACKGROUND

 We will discuss the facts of this case to the extent they are relevant to our disposition
of Harris's appeal. (1) The statements that Harris sought to suppress were obtained by law enforcement
officers during their investigation into the murder of Jason Gonzalez in June 2005. The murder
allegedly happened during a robbery of Gonzalez's home. One of the suspects in the crime
was Russell Alligood. Police obtained a statement from Alligood in which he admitted being
involved in the murder and named three other participants: Brandon Hammock, Eric Siperko, and
a person whom Alligood knew only as "Romeo." Officers suspected that "Romeo" was a nickname
belonging to Harris.

 On June 16, 2005, Detectives Gary Hall and Ed Peck of the Harker Heights Police
Department drove to Harris's residence to verify that Harris was "Romeo." Detective Hall testified
that they were in plain clothes and traveling in an unmarked police vehicle. When they arrived, they
knocked on the door, and Harris answered. When the detectives asked Harris if he was "Romeo,"
Harris responded that he was. Hall then asked Harris if he could step outside and speak to him. Hall
testified that Harris agreed. Hall also testified that he did not make Harris any promises or threaten
him in any way to get him to talk or come out of his house. As they walked outside, Hall asked
Harris, "You tell me what happened on Iron Jacket?" (2)

 Detective Hall explained that after he asked this question, Harris was "[r]ather
gushing with information" about what happened. According to Hall, Harris told him that he,
Alligood, Hammock, and Siperko had kicked in the door to Gonzalez's house. Harris and Alligood
then entered the house from one side while Hammock and Siperko entered it from the other side. 
Harris told Hall that he heard someone yell, "Get down, get down," and then heard a gunshot. The
four then left the house, but Harris and Alligood returned to take Gonzalez's truck. When Hall asked
Harris where the truck was now located, Harris told him, "Out there in the lake." Hall then asked
Harris, "Mr. Harris, you have a lot of information, valuable information. I'd like to get that from
you. If you would please, I'd like to use you for a witness. Would you come down to the police
department so I can get this on videotape?"

 At trial, the State asked Detective Hall the following questions about his encounter
with Harris at his house:


Q: Did you arrest him?


A: No, sir.


Q: Did you place him in custody?


A: No, sir.


Q: Did you tell him he would be arrested or placed in custody?


A: No.


. . . .


Q: Did you place Matthew Harris in the back of your car or did he ride with you
down to the Harker Heights police station?


A: He drove his own vehicle.


Q: Did he follow you there?


A: No, sir.


Q: So you went straight from the house . . . down to the Harker Heights Police
Department?


A: Correct.


Q: How long were you at the Harker Heights Police Department before Matthew
Harris showed up?


A: I believe approximately 30 minutes, if not longer.



 When asked what happened when Harris arrived at the police department, Hall
testified, "He showed up and we went in and took him right into the interview room where it
was already set up, sat him down and I handed him a Miranda form.[ (3)] He initialed it, signed one
of them. And then we went into the conversation from there." Harris also signed and initialed a
"voluntary appearance form." According to Hall, at this time, Harris was not in custody. When
asked if he thought at this point that Harris "was a witness or he was more involved than that and
could be a suspect," Hall testified, "More involved, could be a suspect." However, Hall did not
know exactly what offense Harris could be charged with, only that what Harris had told him at the
house was enough to get him charged with "something."

 On cross-examination, Detective Hall testified that, during the interview at the police
department, Harris asked Hall if he was "going to give him any rope to hang [himself]." Hall told
Harris, "Like I told you out there at the house, I'd like to use you for a witness." Harris then asked,
"just a witness?" Hall responded, "just a witness." Defense counsel then asked Hall, "Now, if he's
just a witness, why did you have him sign off on Miranda warnings?" Hall answered that his
lieutenant told him to do so "just prior" to the interview.

 Detective Hall testified that, at the conclusion of the videotaped interview, he had
probable cause to arrest Harris. However, he told Harris that he was free to leave. Hall then spoke
with his supervisor, Detective Charles Gee, who informed Hall that he was supposed to have
obtained a written statement from Harris prior to releasing him.

 Detective Gee and Detective Peck then went to Harris's place of employment to ask
Harris to return to the police station and provide a written statement. Gee testified, "And I
introduced myself to Mr. Harris and I told him, 'I'm Detective Gee with the Harker Heights Police
Department, I need you--I would like for you to come up and give a voluntary statement of what
transpired on your video statement.'" Gee further testified:


Q: Did you tell him that you preferred that it be in writing?


A: Yes, I said, "We need to get it in writing, tie up the loose ends."


Q: And what was his response?


A: He said, "Well"--he said, he would. He said he would when he had a chance
to get off of work.


 I said, "Okay, that's fine."


 I said, "It's a voluntary statement. You'll be able to leave and come back."



 Approximately two to three hours later, Harris returned to the police station, again
in his own vehicle. Detective Gee met Harris in the lobby and took him to his office. Gee then
asked Lieutentant Loretta Fox, the department's administrative division lieutenant, to come into the
office and type out Harris's statement. Lieutenant Fox testified that Harris basically just dictated
the statement to her while she typed it. Occasionally, Fox explained, when Harris got "too general"
in his statement and used the word "we," Fox "would ask who 'we' were and he would tell [her]." 
Gee testified that as Harris was dictating the statement to Fox, he went in and out of his office,
working on other things. At one point, Gee recounted, "I believe I even offered him a coke." After
the statement was completed, Fox printed it out and handed it to Gee. Gee testified that he "went
over the statement with Mr. Harris word for word," and then "had him initial the left and right of
each page, beginning and end of each page." Harris also signed the last page of the statement. Next,
Gee explained, Harris gave his consent for the police to search his vehicle. During the search, Harris
gave Gee a radar detector that Harris believed was stolen property. After that, Gee testified, "I
thanked him very much for his cooperation and he left. He was free to go."

 The next day, Detective Hall obtained arrest warrants for all four suspects. Harris
was subsequently arrested and charged with capital murder.

 Prior to trial, Harris sought to suppress the oral statement he made to Detective Hall
at the house, the videotaped statement he made during his interview at the police station, and the
written statement he dictated to Lieutenant Fox. In his motion to suppress, Harris contended that the
statements he made were obtained after law enforcement officers led him to believe that he was only
a witness and not a suspect in the crime. Therefore, according to Harris, his statements were not
"freely and voluntarily made without compulsion or persuasion." See Tex. Code Crim. Proc. Ann.
art. 38.21 (West 2005).

 The district court denied Harris's motion to suppress. On the record, the district court
recited its findings of fact and conclusions of law, including that Harris was not in custody at the
time he made his statements, that he voluntarily went to the police department prior to giving both
his videotaped statement and his written statement, that his statements were voluntarily made, and
that his statements were not the product of custodial interrogation.

 The statements were admitted into evidence at trial, and Harris was subsequently
convicted of capital murder. This appeal followed.


STANDARD OF REVIEW

 A trial court's ruling on a motion to suppress is reviewed on appeal for abuse of
discretion. State v. Dixon, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). In other words, the trial
court's ruling will be upheld if it is reasonably supported by the record and is correct under
any applicable legal theory. Id. The trial judge is the sole trier of fact and judge of the credibility
of the witnesses and the weight to be given to their testimony. State v. Ross, 32 S.W.3d 853, 855
(Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give trial
courts almost complete deference in determining historical facts, but we review de novo the trial
court's application of the law. Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). 


ANALYSIS

 At the hearing on his motion to suppress, Harris argued that his statements should
be suppressed pursuant to article 38.21 of the code of criminal procedure. Under article 38.21, "A
statement of an accused may be used in evidence against him if it appears that the same was freely
and voluntarily made without compulsion or persuasion[.]" Tex. Code Crim. Proc. Ann. art. 38.21. 
A statement may be deemed "involuntary" under three different theories: (1) failure to comply with
article 38.22 of the code of criminal procedure (the Texas confession statute); (2) failure to comply
with the dictates of Miranda v. Arizona, 384 U.S. 436 (1966); or (3) failure to comply with due
process or due course of law because the statement was not freely given (e.g. coercion, improper
influences, incompetency). Wolfe v. State, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996); Moore
v. State, 233 S.W.3d 32, 44 (Tex. App.--Houston [1st Dist.] 2007, no pet.). In this case, Harris
asserts that his statements were obtained in violation of due process because (1) they were obtained
through "deception," and (2) they "were not properly Mirandized."


Custody

 We will first address the issue of compliance with Miranda. Police officers are not
required to administer Miranda warnings to everyone whom they question, nor is this requirement
of warnings to be imposed simply because the questioning takes place in the police station. Oregon
v. Mathiason, 429 U.S. 492, 495 (1977). Miranda warnings are only required where there has been
a restriction on a person's freedom as to render him in "custody." Id.

 "A person is in custody if, under the totality of the circumstances, a reasonable person
would believe his freedom of movement was restrained to the degree associated with a formal
arrest." Stansbury v. California, 511 U.S. 318, 322 (1994); Dowthitt v. State, 931 S.W.2d 244,
254-55 (Tex. Crim. App. 1996); Houston v. State, 185 S.W.3d 917, 920 (Tex. App.--Austin 2006,
pet. ref'd). "The 'reasonable person' test presupposes an innocent person." Florida v. Bostick,
501 U.S. 429, 438 (1991) (emphasis in original); Dowthitt, 931 S.W.2d at 254. Moreover, the initial
determination of custody depends on the objective circumstances of the interrogation, not the
subjective views of the police or the person being questioned. Stansbury, 511 U.S. at 323; Dowthitt,
931 S.W.2d at 254; Houston, 185 S.W.3d at 920. The subjective views of the police regarding
custody may be relevant as a circumstance of the interrogation if they are conveyed to the individual
being questioned, but only to the extent that the communication of those views would affect
a reasonable person's understanding of his freedom of action. See Stansbury, 511 U.S. at 325;
Dowthitt, 931 S.W.2d at 254; Houston, 185 S.W.3d at 920.

 As a general rule, when a person voluntarily accompanies law enforcement to a
certain location, even though he knows or should know that law enforcement suspects that he may
have committed or may be implicated in committing a crime, that person is not restrained or "in
custody." Livingston v. State, 739 S.W.2d 311, 327 (Tex. Crim. App. 1987); Miller v. State,
196 S.W.3d 256, 264 (Tex. App.--Fort Worth 2006, pet. ref'd). More specifically, so long as the
circumstances show that a person is acting only upon the invitation, request, or even urging of law
enforcement, and there are no threats, either express or implied, that he will be taken forcibly,
the accompaniment is voluntary, and such person is not in custody. Anderson v. State, 932 S.W.2d
502, 505 (Tex. Crim. App. 1996); Miller, 196 S.W.3d at 264. However, the mere fact that an
interrogation begins as noncustodial does not prevent custody from arising later; police conduct
during the encounter may cause a consensual inquiry to escalate into custodial interrogation. Ussery
v. State, 651 S.W.2d 767, 770 (Tex. Crim. App. 1983); Miller, 196 S.W.3d at 264.

 Texas courts have recognized at least four general situations which may constitute
custody: (1) when the suspect is physically deprived of his freedom of action in any significant way,
(2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement
officers create a situation that would lead a reasonable person to believe that his freedom of
movement has been significantly restricted, and (4) when there is probable cause to arrest and law
enforcement officers do not tell the suspect that he is free to leave. Dowthitt, 931 S.W.2d at 255;
Trejos v. State, 243 S.W.3d 30, 44 (Tex. App.--Houston [1st Dist.] 2007, pet. ref'd). "Concerning
the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect;
such manifestation could occur if information substantiating probable cause is related by the officers
to the suspect or by the suspect to the officers." Trejos, 243 S.W.3d at 44 (emphasis added).

 Here, Harris contends that the fourth situation was implicated. He argues that as
soon as he began telling Detective Hall about his involvement in Gonzalez's murder, Hall had
probable cause to arrest him. (4) At that point, Harris contends, he was in custody.

 We agree with Harris that the record supports a finding that Hall had probable
cause to arrest Harris as soon as Harris explained his involvement in the murder. In fact, Hall
acknowledged in his testimony that he had probable cause to arrest Harris at least as early as when
Harris completed his videotaped interview at the police department. And, Hall testified, even before
Harris arrived at the police department, Hall knew that what Harris had told him at the house was
enough to get Harris charged with "something." However, even if Hall's knowledge of probable
cause was "manifested" to Harris, see Dowthitt, 931 S.W.2d at 257 (holding that officer's knowledge
of probable cause was manifested to suspect when suspect admitted to officer "that he was present
during the murders . . . and a reasonable person would have realized the incriminating nature of
the admission."), it would not, without more, establish custody. Custody is established "if the
manifestation of probable cause, combined with other circumstances, would lead a reasonable person
to believe that he is under restraint to the degree associated with an arrest." Dowthitt, 931 S.W.2d
at 255 (emphases added). In Dowthitt, for example, these other circumstances included a lengthy
interrogation lasting over 12 hours from the time the suspect first appeared at the police station to
the time he made the incriminating statement, police officers accompanying the suspect to the
restroom, and police officers ignoring the suspect's requests to see his wife. Id. at 257.

 The record supports an implied finding by the district court that such circumstances
were not present in this case. At the house, Harris explained to Detective Hall his involvement in
the crime. Harris did so, Hall testified, without Hall making any threats or promises. In fact,
according to Hall, Harris was "rather gushing with information" about what happened. Hall then
told Harris, "Mr. Harris, you have a lot of information, valuable information. I'd like to get that
from you. If you would please, I'd like to use you for a witness. Would you come down to the
police department so I can get this on videotape?" Harris agreed. There is no indication in the
record that Detectives Hall and Peck engaged in conduct at Harris's house that would "cause a
consensual inquiry to escalate into custodial interrogation." See Ussery, 651 S.W.2d at 770. To
the contrary, Hall testified that he did not make any promises or threats to Harris during the
encounter at the house.

 After Harris agreed to go to the police department, the officers left the house and
went to the police department unaccompanied by Harris. Harris traveled to the police department
separately in his own vehicle and arrived approximately 30 minutes after the officers arrived. Upon
his arrival, Harris was taken to an interview room. He signed a "voluntary appearance form" which
provided, "I am here of my own free will and under no coercion from any peace officer, person,
or other agency. I further understand that I am not under arrest or detention and I may stop any
interview and voluntarily leave these premises at any time." The record also reflects that Harris 
read, initialed, and signed written Miranda warnings. (5) There is no indication in the record of any
conduct by Detective Hall or any other officer before, during, or after the interview that would
"cause a consensual inquiry to escalate into custodial interrogation." See id. After the interview was
complete, Detective Hall told Harris that he was free to leave.

 Then, when Harris was later asked to return to the police department to provide a
written statement, Harris told Detective Gee that he would come in after he got off from work. 
Detective Gee told Harris, "Okay, that's fine." Gee added, "It's a voluntary statement. You'll be
able to leave and come back." Again, Harris drove himself to the police department. Once there,
he was taken to Gee's office, where Harris dictated his statement to Lieutenant Fox, who was the
only officer present in the room the entire time. Gee was "in and out" of the office and even offered,
at one point, to get Harris "a coke." There is no indication in the record that either Fox or Gee
engaged in any conduct before, during, or after the dictation of Harris's statement that would "cause
a consensual inquiry to escalate into custodial interrogation." See id. After Harris finished dictating
his statement, he was again told that he was free to leave.

 On numerous occasions, circumstances similar to the above have been held to
not constitute custody. See, e.g., California v. Beheler, 463 U.S. 1121, 1124-25 (1983) (finding no
custody when suspect voluntarily accompanied police to station, talked for less than 30 minutes, and
was permitted to return home); Mathiason, 429 U.S. at 495 (same); Meek v. State, 790 S.W.2d 618,
622 (Tex. Crim. App. 1990) (finding no custody when suspect came to station voluntarily at time
of his own choosing, was allowed to step outside building and go unaccompanied to his car during
interviews, and "a few hours" later was allowed to leave unhindered after statements were
completed); Dancy v. State, 728 S.W.2d 772, 777-79 (Tex. Crim. App. 1987) (finding no custody
when suspect voluntarily came with police to station, voluntarily answered questions, gave hair
samples, allowed police to take his shoes to run print comparisons, and was arrested at conclusion
of 38-minute interview); Turner v. State, 685 S.W.2d 38, 41-43 (Tex. Crim. App. 1985) (finding no
custody when witness who was not suspect was contacted by police, voluntarily went to police
station to make statement, and was immediately read warnings when he made statement that caused
police to suspect him); Trejos, 243 S.W.3d at 46-47 (finding no custody when suspect "rode with
a police officer to the station" and "was only interviewed by one police officer, who was in plain
clothes, and in an office-like setting."); Houston, 185 S.W.3d at 921 (finding no custody when
suspect voluntarily came to police station and "the detectives specifically told [the suspect] that he
was not under arrest and implied through their questioning that he could leave."); Garcia v. State,
106 S.W.3d 854, 858-59 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd) (finding no custody when
suspect "voluntarily went to the police department, and after he was told that he could leave, he
voluntarily gave a videotaped statement."); White v. State, 931 S.W.2d 736, 742 (Tex. App.--Corpus
Christi 1996, pet. ref'd) (finding no custody when suspect voluntarily came to police department on
multiple occasions, gave multiple statements, and was told he was free to leave after each statement). 

 There are no facts present here that distinguish this case from the above cases. We
conclude that the record supports the district court's finding that Harris was not in custody when he
provided his statements to the police. Therefore, the requirements of Miranda were not implicated.


Deception

 Even in the absence of custody, due process may be violated by admitting confessions
that are not voluntarily given. Wolfe v. State, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996);
Martinez v. State, 131 S.W.3d 22, 24 (Tex. App.--San Antonio 2003, no pet.). A statement is not
voluntary if there was "official, coercive conduct of such a nature that any statement obtained
thereby was unlikely to have been the product of an essentially free and unconstrained choice by its
maker." Alvarado v. State, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995); Martinez, 131 S.W.3d
at 24-25. Harris contends that his statements were not voluntarily given because Detective Hall
deceived him into believing that he was only a witness to the crime and not a suspect.

 The issue here is not whether Detective Hall was deceptive (as the State conceded
at the suppression hearing that he was), but whether this deception rendered Harris's statements
involuntary. This Court has previously held, "Voluntariness is not destroyed, and a confession
induced by deception or trickery is not inadmissible, unless the method used was calculated to
produce an untruthful confession or was offensive to due process." Dotsey v. State, 630 S.W.2d 343,
349 (Tex. App.--Austin 1982, no pet.).

 The deception of which Harris complains was the statement by Detective Hall on two
occasions (at Harris's house and during the interview at the police department) that he would like
to use Harris "as a witness" when, in fact, Hall believed that Harris "could be a suspect" and, as we
explained earlier, had probable cause to arrest Harris as soon as Harris first explained the nature of
his involvement in the murder. However, there is nothing in the record to indicate that this particular
deception was "calculated to produce an untruthful confession or was offensive to due process." 
Rather, Hall's deception is similar to police conduct that other courts have found to not violate
due process. See, e.g., Green v. State, 934 S.W.2d 92, 100 (Tex. Crim. App. 1996) (finding that
misrepresentation by police "that there was an eyewitness to the murder" did not render confession
involuntary because statement "directly relate[d] to appellant's guilt"); Snow v. State, 721 S.W.2d
943, 946 (Tex. App.--Houston [1st Dist.] 1986, no pet.) (finding that statement by police officer that
suspect "was being interviewed only as a witness" did not violate due process); see also Frazier
v. Cupp, 394 U.S. 731, 737-39 (1969) (refusing to find that defendant who confessed, after being
falsely told that his codefendant has turned State's evidence, did so involuntarily); Holland
v. McGinnis, 963 F.2d 1044, 1051-52 (7th Cir. 1992) ("Of the numerous varieties of police trickery,
however, a lie that relates to a suspect's connection to the crime is the least likely to render a
confession involuntary"); but see Lynumn v. Illinois, 372 U.S. 528, 533-34 (1963) (holding
confession involuntary when police distorted suspect's rational choice by deceiving her into
believing "that state financial aid for her infant children would be cut off, and her children taken
from her, if she did not 'cooperate.'"). We conclude that the record supports the district court's
finding that Harris's statements to the police were voluntarily made.

 The district court did not abuse its discretion in denying Harris's motion to suppress. 
We overrule Harris's sole issue on appeal.


CONCLUSION

 We affirm the judgment of the district court.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: July 11, 2008

Do Not Publish
1. A more complete discussion of the underlying facts may be found in this Court's opinions
affirming the convictions of two of Harris's three co-defendants. See Alligood v. State, No. 03-06-00516-CR, 2007 Tex. App. LEXIS 5473 (Tex. App.--Austin July 12, 2007, no pet. ) (mem. op.,
not designated for publication); Hammock v. State, No. 03-06-00523-CR, 2007 Tex. App. LEXIS
5474 (Tex. App.--Austin July 11, 2007, pet. ref'd) (mem. op., not designated for publication). As
of the date of this opinion, the appeal of a third co-defendant, Eric Siperko, remains pending.
2. Iron Jacket was the name of the street on which the victim lived.

3. See Miranda v. Arizona, 384 U.S. 436 (1966).
4. As support for this argument, Harris relies on Ruth v. State, 645 S.W.2d 432 (Tex. Crim.
App. 1979), in which the court of criminal appeals held, "The appellant's statement that he had
shot the victim immediately focused the investigation on him and furnished probable cause to
believe that he had committed an offense. After that time, the continued interrogation must be
considered a custodial one." 645 S.W.2d at 436. We note, however, that Ruth was decided before
Dowthitt v. State, 931 S.W.2d 244 (Tex. Crim. App. 1996), in which the court of criminal appeals
held that "custody is established if the manifestation of probable cause, combined with other
circumstances, would lead a reasonable person to believe that he is under restraint to the degree
associated with an arrest." 931 S.W.2d at 255 (emphases added).
5. We note that the reading of Miranda warnings does not automatically transform a non-custodial setting into a custodial interrogation. See United States v. Bautista, 145 F.3d 1140, 1148
(10th Cir. 1998); Sprosty v. Buchler, 79 F.3d 635, 642 (7th Cir. 1996); Davis v. Allsbrooks, 778 F.2d
168, 172 (4th Cir. 1985) (to hold that Miranda warnings create custody "would convert admirable
precautionary measures on the part of officers into an investigatory obstruction"). However, the
giving of Miranda warnings is a factor in the determination of whether a reasonable person would
believe that he is in custody. See Bautista, 145 F.3d at 1148; Sprosty, 79 F.3d at 642. The record
in this case supports an implied finding by the district court that this one factor suggesting custody
was outweighed by the other factors suggesting that Harris was not in custody, including the
statement in the "voluntary appearance form" that Harris was "not under arrest or detention and I
may stop any interview and voluntarily leave these premises at any time."