

# NUMBER 13-21-00263-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

RONNIE RODRIGUEZ JR.,                                         **Appellant,**

**v.**

THE STATE OF TEXAS,                                              **Appellee.**

## On appeal from the 36th District Court
## of San Patricio County, Texas.

# OPINION

### Before Justices Benavides, Longoria, and Tijerina
### Opinion by Justice Tijerina

A jury found appellant Ronnie Rodriguez Jr. guilty of capital murder of Juan Sandoval III a/k/a Juan Jose Martinez Sandoval III ("Baby Juan") and Nicky Sandoval ("Nicky"), and he was sentenced to life without the possibility of parole. *See* TEX. PENAL CODE ANN. §§ 19.02, 19.03. By four issues, appellant contends that (1) the evidence was insufficient to support his conviction, (2) the trial court improperly submitted the case to

the jury on the second amended indictment, (3) a different date was in the jury charge than alleged in the indictment, thus, the trial court should have submitted the case on the original date in the unamended indictment, and (4) the trial court's denial of his request for a ten-day continuance was erroneous and caused him harm.[1] We affirm.

## I.  SUFFICIENCY OF THE EVIDENCE

By his first issue, appellant contends that the evidence is insufficient to support the jury's verdict. Specifically, appellant argues that although "[t]here is no dispute that [an eyewitness, Juan Espinosa[2]] testified that [appellant] shot [the victims, Baby Juan and Nicky]," in this case "no rational jury could have believed this evidence." Appellant claims that "a rational juror could not have believed" Espinosa's testimony "because [appellant's] father [Big Ronnie] had just shot [Espinosa] in the head with the same gun" used to kill the victims and Espinosa "testified that his sons were shot in the back of their heads" but "the medical examiner testified that the victims were shot from the front." Appellant further argues that all other eyewitnesses testified that Big Ronnie shot the victims; "[t]hus, no rational juror could have believed that [appellant] shot the victims." Appellant also asserts that even under the law of parties, he is not guilty.

---

[1] We have reorganized and renumbered appellant's issues for purposes of our analysis.

[2] The parties refer to this witness as Juan Espinosa who is also referred to in the record as Juan Sandoval. We will refer to this witness as Espinosa throughout this memorandum opinion for ease of reading.

Espinosa's father, Juan Sandoval Sr. ("Sandoval Sr."), and Espinosa's three sons, Baby Juan, Nicky, and Jeremy Rodriguez were all killed during an altercation with appellant, his father, Ronnie Rodriguez Sr. ("Big Ronnie") and his brother, Jeremey Rodriguez ("Little Jeremy"). We will use the nicknames of the parties used by the witnesses at trial for consistency.

Appellant is not charged with the deaths of Sandoval Sr. and Jeremy Sandoval.

2

## A.    The Evidence

Espinosa testified that a confrontation occurred between appellant's family members and him and his four sons, Baby Juan, Justin Sandoval, Nicky, and Jeremy Sandoval. According to Espinosa, the situation began on the evening of October 12, 2018, when appellant's brother, "Little Jeremy," came to his house insisting that Espinosa's father, Sandoval, Sr. needed to contact Little Jeremy's father, Big Ronnie. Espinosa stated that Little Jeremy was cussing and seemed upset, so Espinosa asked Little Jeremy to leave, but Little Jeremy refused. Espinosa testified that he and Nicky then went inside and waited for Little Jeremy to leave, which he eventually did without further incident.

Espinosa stated that the next day, he, his wife, sons, and Sandoval Sr., went about their usual routine; but suddenly, Jeremy Sandoval "comes inside and he goes, 'Hey, they got grandpa in the barrio,' in the neighborhood." Espinosa clarified that he believed that Little Jeremy and appellant had "barricaded" Sandoval Sr. in the neighborhood, and Jeremy Sandoval said, "They're going to hurt him." Espinosa said that Jeremy Sandoval then "booked it out the door . . . [a]nd we ran right after him" and "got in the car and took off." The group consisted of Espinosa, Jeremy Sandoval, Baby Juan, and Nicky. The group then arrived at a home where Big Ronnie stopped his vehicle. Espinosa stated that the group then exited the vehicle, and appellant's relative, Rudy Rodriguez, who was on the front porch of the home, started "cussing [the group] out." The group then approached a stop sign where Big Ronnie had parked his vehicle, and Espinosa spoke with Big Ronnie. When asked what they discussed, Espinosa replied, "About sons." Espinosa

3

clarified that the men discussed that appellant and Little Jeremy were harassing Sandoval Sr., and according to Espinosa, Big Ronnie agreed that his sons had been bothering Sandoval Sr., and said, "I already talked to them. I don't know what their deal is . . . . They don't listen." Espinosa said, "Right when he said that, all I heard was 'Boom.'" According to Espinosa, "the dirt in front of [his] foot just . . . . And [he] looked over and it was [appellant]. [Appellant] fired another shot, 'Boom.' That time to [his] boys." Espinosa clarified that he saw appellant shoot "twice" in his direction. Espinosa said, "That's when I told my boys to get the hell out of the way . . . . And then they started scattering."

Espinosa stated that appellant then handed the gun to Big Ronnie. During his testimony, Espinosa pointed at a diagram he drew of the location with marks showing where appellant and all the parties had been when the shootings occurred. Espinosa said that after appellant shot at him, he "went behind the truck by the road." Espinosa stated: "[Appellant] and [Little Jeremy] came at me. They wanted to fight. So when I was going to hit him, [Big Ronnie] blew out my face." Espinosa clarified that when he said that Big Ronnie "blew out" his face, he meant that Big Ronnie shot him on the left side of his face.

Espinosa testified that he then witnessed Big Ronnie shoot Sandoval Sr., and Sandoval Sr. "fell down." Espinosa continued as follows: "And then my boy, Jeremy [Sandoval], grabs Big Ronnie and they are struggling. And that's when [appellant] hits [Jeremy Sandoval] in the back of the head. And that's when [Jeremy Sandoval] got shot." Espinosa clarified that although he did not remember when Big Ronnie lost the gun, he "saw [appellant] grab the gun and [shoot] towards" Baby Juan and Nicky. In summary, Espinosa testified that after Big Ronnie shot him and Sandoval Sr., Jeremy Sandoval

4

wrestled with Big Ronnie for the gun, appellant hit Jeremy Sandoval over the head, at some point Big Ronnie lost possession of the gun, and appellant then shot Baby Juan and Nicky. The prosecutor asked Espinosa if Baby Juan and Nicky were also wrestling Big Ronnie for the gun. Espinosa replied, "No sir."

Christian Payne, a patrol deputy with the San Patricio County Sheriff's Department, testified that he received a dispatch prior to the murders at approximately 5:30 p.m. Deputy Payne said, "For the call that I heard the dispatch [report] there was an elderly—dispatch advised an elderly man was being assaulted by two juveniles with weapons around . . . Dolores Street." Deputy Payne stated that he went to the Sheriff's office to get his patrol unit, and while en route, he received another dispatch that "advised there'd been shots fired and multiple victims were at [a residence on] Wilburn." When Deputy Payne arrived at the scene, he was ushered to an area where four males were "laying on the ground relatively in a semi-circular fashion and another male subject standing" who "appeared [to have] been shot in the face. Blood coming down his face." Deputy Payne stated that he witnessed other officers arrest appellant near the scene of the killings, and subsequently, he located appellant's vehicle and secured consent from the co-owner to search it. Deputy Payne testified that he ran to the location of the arrest, and he arrived after appellant had been taken into custody.

Adel Shaker, M.D., the medical examiner for Nueces County, Texas, testified that Baby Juan and Nicky died due to gunshot wounds to each of their heads. Dr. Shaker stated that regarding Baby Juan, "the gunshot wound of entrance was on the right side of the face below the top of the head" and the bullet "exited the left posterior occipital scalp."

5

Dr. Shaker clarified that "[p]osterior means back. Occipital means . . . [s]kull." On cross-examination, Dr. Shaker reiterated that the bullet entered Baby Juan's head on the front and exited on the back of his head. Appellant asked, "So he did not have a gunshot entry wound to the back of his head?" Dr. Shaker replied, "No. It was front to back."

Regarding Nicky, Dr. Shaker testified that the cause of his death was a "[p]enetrating gunshot wound to the head. Dr. Shaker opined that the bullet "penetrated the body in a backwards—from the front to the back—downwards and rightwards," and he "retrieved it from the back of the head." In addition, Dr. Shaker said that he "noticed another gunshot wound to the left side of the head." Dr. Shaker explained, that although not terminal, the bullet "grazed the skin and subcutaneous tissue without entering the cranial cavity on the left side." The cause of Nicky's death was the bullet that entered his head. On cross-examination, appellant asked, "Nicky was not shot in the back of the head, correct?" Dr. Shaker responded, "Correct."

The trial court also admitted several pictures of Baby Juan's and Nicky's bodies taken during their autopsies. These pictures showed the entry and exit wounds. Nolanna Ortiz, an officer who responded to the shootings, testified that "State's Exhibit 19 shows the entry wound and Nick Sandoval's face" and "State's Exhibit 20 shows the trajectory in which the bullet passed through" Nicky. On cross-examination, appellant asked, "None of the victims were shot in the back of the head, based upon your examination, correct?" Ortiz replied, "No, they were not."

Joshua Sepulveda, a trooper with the Texas Department of Public Safety, testified that he arrived at the scene after the murders occurred. Trooper Sepulveda stated that

6

he was "watching" a residence near the area where the murders occurred and where a suspect's vehicle had been parked. Sepulveda noticed a white Dodge Charger "driving around very suspiciously" in that "[i]t would stop in front of the house, wait a few minutes and then take off again." Trooper Sepulveda said, "And then it would circle back around the block. It was circling a few times. And that is what caught my attention on that."

Trooper Sepulveda noticed that at one point a male exited the home where the suspect's vehicle, a Charger, was parked, and the man entered the Charger, which belonged to appellant and his girlfriend. The Charger left the home, which was not the home where the killings occurred. Based on this, Trooper Sepulveda decided to make a traffic stop on the Charger "[b]ecause there was a possible suspect that left the residence." Trooper Sepulveda testified that he was looking for an appropriate place to make the traffic stop, but the driver of the Charger eventually pulled over before Trooper Sepulveda turned on his overhead lights. Trooper Sepulveda then turned on his overhead lights. Trooper Sepulveda identified appellant as the person sitting in the passenger side of the Charger, and Trooper Sepulveda detained appellant and then transported him "to the county." Trooper Sepulveda clarified that he took appellant to the Criminal Investigation Division, "escorted him inside to a holding room and [another officer] interviewed him."

The State played a surveillance video taken by neighbors of the residence where the murders occurred. Samuel Cody Lankford, a Texas Ranger, testified that in the video, appellant, Big Ronnie, and Little Jeremy left the scene of the murders approximately four minutes prior to the police arriving at the scene. On cross-examination by appellant,

7

Ranger Lankford agreed that Espinosa told officers in three separate statements that appellant shot Baby Juan and Nicky in the back of the head. Ranger Lankford also agreed that none of the victims were shot in the back of the head.

On redirect examination by the State, Ranger Lankford stated that "there is no doubt in [his] mind" that appellant discharged a firearm toward Espinosa on the date of the murders. The State asked, "If you believed that [appellant] was acting lawfully while discharging that firearm at [Espinosa], would you have requested an arrest warrant for the deadly conduct?" Ranger Lankford replied, "[F]iring a weapon at somebody is deadly conduct . . . So, yes, I would have filed that warrant with the information that I had." Although Ranger Lankford could not recall "who they said initially the shots were fired at[,] . . . [he] had statements from multiple people that [appellant] fired the weapon in the direction [of the victims]." Ranger Lankford stated that he found the gun used to kill Baby Juan and Nicky buried in a field. According to Ranger Lankford, no one other than the victims that were shot reported sustaining any injuries during the incident, and when he encountered appellant, Ranger Lankford did not observe any injuries and appellant made no complaints of any injuries. Ranger Lankford described appellant's demeanor as "somewhat nonchalant. Relaxed."

Appellant called his cousin, Vanessa Ramirez, to testify. She testified that on the day of the murders, she was in a vehicle with her husband when she saw that appellant and Little Jeremy used appellant's Charger to block Sandoval Sr.'s vehicle with Sandoval Sr. and his wife in the vehicle. Ramirez saw Sandoval Sr. punching appellant's vehicle and "swearing at them." Ramirez scolded Sandoval Sr. and instructed him to discuss the

8

problem with appellant's father because appellant and Little Jeremy "were young." According to Ramirez, a neighbor then informed the arguing parties that the police were coming, and Sandoval Sr. told his wife to call his children and to send everyone. Ramirez testified that Sandoval Sr. "ends up taking off, you know, burning rubber. And then [all present parties] end up leaving." On cross-examination, Ramirez acknowledged that she and appellant were being aggressive during the incident. However, she claimed that Sandoval Sr. had been more aggressive. Ramirez stated that she was not aware that the person who called 911 told the dispatcher that two juveniles with weapons were assaulting an old man.

Appellant then called Roberto Rodriguez, appellant's uncle, who testified that "the Sandovals" arrived at the home where a party was being held for his sister's son. Roberto did not see appellant with a gun. However, when asked what happened, Roberto stated that appellant "got the gun out" because according to Roberto, the Sandovals were there to fight. Appellant asked, "At any point, did you see [appellant] pull a gun out?" Roberto replied, "Yes." Appellant asked, "What did he do," and Roberto said, "Warning shots to the ground." Roberto claimed that the Sandovals did not leave and "they went towards them. . . [so, t]hat's when my brother[, Big Ronnie,] took the gun away from [appellant] and then told them again, 'Please. Please leave.'" Roberto testified that the Sandovals did not leave, Espinosa "came towards" Big Ronnie, and Big Ronnie then shot Espinosa.

Roberto testified that Big Ronnie shot all of the victims and that appellant did not shoot anyone.[3] Roberto clarified that appellant only fired two warning shots "to the

---

[3] Roberto did not specify exactly who he claimed Big Ronnie shot.

ground." On cross-examination, Roberto denied that appellant fired the warning shots in the Sandovals' direction, but he admitted that they were close. According to Roberto, after Big Ronnie killed Sandoval Sr., four of the Sandovals attacked Big Ronnie, took him down to the ground, he removed Espinosa from Big Ronnie, and Big Ronnie "shot three shots up to the sky" killing Jeremy Sandoval, Nicky, and Baby Juan. Roberto stated that Big Ronnie stayed at the home "for a while and then just—he got up and just left." Roberto clarified that appellant left with Big Ronnie.

Little Jeremy testified that on the date of the murders, Sandoval Sr. "got out of the vehicle and tried threatening [appellant]," and he hit the back of appellant's vehicle. According to Little Jeremy, appellant "got off and he told him, 'Leave me alone.'" Little Jeremy stated that Sandoval Sr. refused to stop, so he exited the vehicle and "told him, 'Can you leave?'" Little Jeremy testified that his cousin Vanessa Ramirez, who arrived at the scene, told Little Jeremy to leave because the police were contacted. Little Jeremy denied that he or appellant had a weapon during this incident.

Regarding the incident at the residence, Little Jeremy said that Big Ronnie and appellant asked the Sandovals "to leave nicely," but the Sandovals "kept coming, coming." According to Little Jeremy, when appellant's warning shots failed to stop the Sandovals from approaching, Sandoval Sr. said, "F them, sons. Go get 'em." Little Jeremy claimed that he asked Big Ronnie for help, "[a]nd after that, like, just everything happened. . . . I didn't really see nothing." Little Jeremy admitted that he did not see who shot the victims, but he still claimed that Big Ronnie was responsible for the killings.

On cross-examination by the State, Little Jeremy claimed that Sandoval Sr.

10

attacked appellant's car and wanted to fight appellant and Little Jeremy, who were blocked in by Sandoval Sr.'s vehicle. Little Jeremy stated that Sandoval Sr. and his wife exited their vehicle, and Little Jeremy was scared because he thought they had a weapon. According to Little Jeremy, he and appellant left because his cousin Vanessa Ramirez told the elderly couple to leave him and appellant alone. Little Jeremy stated, "I was just telling him to leave us alone. Like, 'Leave us alone. Leave us alone,'" and appellant said, "To go away. Like, 'Stop hitting my vehicle.'"

Little Jeremy testified that when he was at the scene of the killings, he saw appellant with a gun. He said, "I just seen that he had the weapon[,] and he just let off the warning shot towards the grass." Little Jeremy stated that he ran to his grandmother's house prior to the victims being shot.

Appellant testified that on the date of the murders, he encountered Sandoval Sr. in his vehicle and Sandoval Sr. "rolled down his window[,] and he started [w]hooping and hollering saying why was I accusing him of being a Peeping Tom at my grandfather's house." According to appellant, eventually Sandoval Sr. exited his vehicle and "started hitting" appellant's vehicle and "wanted to fight" appellant. Appellant said that he told Sandoval Sr., "Man, you are an older man, you know, I'm not going to fight you." Appellant stated, "So after he did not want to leave, I decided to be the bigger person and get into my vehicle and leave. So we left that scene. And that's what happened there in that area."

Appellant testified he then went to the residence where a party was being held, and Sandoval Sr. arrived shortly thereafter again wanting to fight; however, appellant and Big Ronnie "ran him off." Appellant stated that Sandoval Sr. came back to the residence

11

with other members of his family, and Big Ronnie asked Espinosa, "What's going on? Why did y'all come back over here? We just ran your dad off." According to appellant the Sandovals then "started to proceed forward" and Big Ronnie "started stepping back." Appellant explained, "So then I pulled out the gun from my side of my hip and I fired—[and] said, 'Y'all need to go ahead and leave. . . . This is the wrong place, wrong time. We're at a birthday party here and y'all want to start drama.'" Appellant testified that the Sandovals continued their forward movement and "[s]o, at that point, [he] shot to the floor one time. Boom." Appellant claimed this caused the Sandovals to get mad, and "[t]hey decide[d] to push forward . . . so we started stepping back—backpedaling."

Appellant said, "And then . . . I seen that they were coming at me, but I didn't want . . . none of my intention was to hurt them with the gun or anything. So my instant thought was to just drop the gun. So when I am backpedaling, I dropped the gun." According to appellant, the Sandovals and Big Ronnie "tried to jump on the gun," and "then they were there tussling for the gun." Appellant stated, then "the gun starts going off."

When asked if he was in fear of "serious bodily injury," appellant said, "Of course. Yes, sir." Appellant explained that he weighs 130 pounds, and the majority of the Sandovals were much bigger. Appellant agreed with his trial counsel that the Sandovals were "two times" his size. Appellant's trial counsel asked, "And did [the Sandovals] have a reputation for going as a group to take care of business?" Appellant responded, "Plenty. Plenty. A lot of things have happened with them . . . ."

Appellant testified that Big Ronnie shot the five Sandovals and that appellant did

12

not shoot anyone. Appellant stated that after Big Ronnie shot the alleged attackers, appellant "ended up getting into [his] car and looking for [his] brother." He then went to his mother's house because" he "knew" that "there w[ere] more people coming." According to appellant, he did not stay very long at his mother's house, and he went to his girlfriend's house where he left his car. Appellant testified that he stayed at his girlfriend's house briefly because her parents said that the police were looking for appellant, and appellant's aunt then picked him up, and he went to his grandmother's house.

On cross-examination by the State, appellant denied that he is in a gang or that he has gang affiliation. Appellant claimed that he does not understand the concept of a gang member wearing certain colors, and when the State asked if he associated with people who wore a "vest with their nickname and the gang association," appellant replied, "It's just a vest that they use." Appellant however acknowledged that he knows "gang members." When asked, "So you don't know what wearing their colors is" or "what driving around dirty is," appellant said that he did not know either phrase.

Regarding the incident wherein appellant claimed that Sandoval Sr. attacked his car, appellant acknowledged that he could have driven away from the scene. The following exchange occurred:

[The State]: Okay. So [Little] Jeremy came up and said that Juan Sandoval, Sr., blocked your car and you couldn't leave. That's not true?

[Appellant]: Yes, it is true. That's how it started. When I'm at the stop sign—I was already approaching the stop sign. His truck was turning into the street that I was already in. And, like I said, the streets are real narrow. So, I mean, he was trying to—his

13

bumper was already almost close to my car. So then, he made—he finally made it in there and then we stayed like that, sideways. At first it was like that. He was catty-corner blocking my car.

Appellant agreed with the State that he was "able to leave" when Vanessa Ramirez arrived at the altercation and Sandoval Sr. started hitting his car. Appellant explained that he did not call the police when the altercation with Sandoval Sr. occurred because "it wasn't necessarily at my house or my father's house. . . ." Appellant testified that when he exited his vehicle, he "was upset, because [he] respect[s] everyone. And whenever [Sandoval Sr.] rolled down his window, he was being very disrespectful." Appellant said, "I was mad because of what he was saying—the way he was coming for me." Appellant acknowledged that Sandoval Sr. did not have any weapons. Appellant testified that he decided to leave the scene when Vanessa Ramirez told him to leave. Appellant stated that although he had the weapon that was used to kill the victims in his vehicle, he did not use or exhibit it during his altercation with Sandoval Sr. Appellant also claimed that Little Jeremy did not have a weapon during the altercation.

Regarding the incident at the party, appellant testified that Sandoval Sr., Espinosa, and Baby Juan "went for the gun," were on top of and "tussling" with Big Ronnie while he was on the ground, and then Big Ronnie shot the three men as they were on the ground tussling. Appellant told the State that Espinosa was not standing when he was shot and that everyone except Nicky and Jeremy Sandoval who were on the ground when Big Ronnie shot the other three men. Appellant stated that he did not see who Big Ronnie shot first because he and Little Jeremy were running from Jeremy Sandoval and Nicky. Appellant said, "We circled around my car and [Jeremy Sandoval and Nicky], they circled

14

around my car as well. So, as I was approaching back to where my dad was on the ground," Big Ronnie had already shot Sandoval Sr., Baby Juan, and Espinosa. Appellant continued as follows:

> At that point . . . , I tried to—I think, if I'm not mistaken, I hit the surviving victim. I hit him in the mouth, because he was still—after he was shot he was bleeding, but I did hit him in the mouth because he was on top of [Big Ronnie] still. But after I hit him, [Espinosa's] two sons [Jeremy Sandoval and Nicky] are barely circling around my car and that's whenever my dad got to get up. After I hit the surviving victim, that's when my dad got to get up and then more shots went off. The other two shots went off.

The State asked appellant if he agreed with some of Espinosa's statements concerning the timeline of events and the positions of the parties involved. Appellant agreed that he shot the warning shot in the area where Espinosa's sons were standing, but he disagreed that the bullet ricocheted off the ground by Espinosa's feet. Appellant agreed that after he fired the warning shot, Espinosa's sons and Sandoval Sr. "went toward" him, that Big Ronnie also moved to his area, and that the Sandovals "started charging" at appellant and Big Ronnie when appellant exhibited his gun. Appellant disagreed with Espinosa's testimony that appellant and Little Jeremy then went over to Espinosa to fight with him. Appellant disagreed that Espinosa was standing when Big Ronnie shot him. Appellant stated that he did not see Big Ronnie shoot Sandoval Sr. Appellant said, "I only seen whenever the third shot happened, when he got his mouth shot in the face—the survivor," Espinosa.

Appellant clarified that Big Ronnie shot Espinosa, Sandoval Sr., and Baby Juan "while they were on top of him," while Jeremy Sandoval and Nicky were chasing appellant and Little Jeremy. Appellant agreed with the State that Big Ronnie lay on the ground as

15

Jeremy Sandoval and Nicky chased appellant and then got up when the men ran toward Big Ronnie's direction. Appellant said, "Yes, sir, because [Espinosa] was still on him when he was shot. When he got shot, he was still on top of [Big Ronnie]. They were still fighting for the gun." According to appellant, he then hit Espinosa "on his face" to "get him off" of Big Ronnie. Appellant explained, "So while I was—while I already circled my car, I ran as fast as I could to [Big Ronnie] and I hit [Espinosa] off [Big Ronnie]. And that's whenever [Big Ronnie] kind of got to move away from [Espinosa]. And then that's whenever Nicky and Jeremy [Sandoval] . . . got killed." Appellant stated that after Jeremy Sandoval and Nicky died, Big Ronnie "didn't know what to do. He was—he wanted to stay around and then he ended up walking towards the front."

According to appellant, Little Jeremy ran after Big Ronnie; however, Big Ronnie continued running so appellant got in his vehicle. Appellant stated that he located Little Jeremy in a field chasing Big Ronnie. Appellant said, "I seen [sic] [Little Jeremy] chasing after [Big Ronnie] and I told him to get in my car. Because I didn't know where [Big Ronnie] was going." Appellant admitted that he did not call 911, and instead took Little Jeremy to their mother's home.

**B.      Standard of Review and Applicable Law**

In reviewing the sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict and determine whether any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014); *Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim.

App. 2010) (plurality op.). Direct and circumstantial evidence are equally probative. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The factfinder is the exclusive judge of the facts, the credibility of witnesses, and the weight to be given their testimony. *Brooks*, 323 S.W.3d at 899. We resolve any evidentiary inconsistencies in favor of the judgment. *Id.*

We measure the sufficiency of the evidence in reference to the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327 (quoting *Malik*, 953 S.W.2d at 240).

Under the Texas Penal Code, a person commits the offense of murder if the person "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02. A person commits capital murder if he "murders more than one person . . . during the same criminal transaction." *Id.* § 19.03.

## C. Discussion

Appellant contends that the evidence is insufficient because there is conflicting evidence showing that he did not shoot Baby Juan and Nicky in this case. He specifically points to testimony stating that Big Ronnie shot them. In addition, appellant complains that Espinosa testified that appellant shot the victims in the back of the head, while

17

evidence was presented that the victims were shot in the front of the head.

These contentions attack the credibility of Espinosa's testimony, not its sufficiency. *See Criff v. State*, 438 S.W.3d 134, 137 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("Courts have consistently held that eyewitness testimony can be sufficient to support a conviction absent additional corroborating evidence, so long as the testimony proves every element of the offense beyond a reasonable doubt."). Our standard of review requires that we defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). In addition, as the sole judge of the weight and credibility of the evidence, the jury is free to believe or disbelieve the testimony of all witnesses and to accept or reject any or all of the defensive evidence. *Braughton v. State*, 569 S.W.3d 592, 608–09 (Tex. Crim. App. 2018); *see also Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("As factfinder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties."). Under our standard of review, we presume that the jury resolved conflicting inferences in favor of the verdict, and we defer to its determination of the evidentiary weight and witness credibility. *Braughton*, 569 S.W.3d at 608; *see Criff*, 438 S.W.3d at 136–37.

Accordingly, the jury could have chosen to disbelieve any testimony claiming that Big Ronnie shot and killed Baby Juan and Nicky, rather than appellant. In addition, the

18

jury could have reasonably found that Espinosa saw appellant shoot the victims but mistakenly believed that appellant shot the victims in the back of the head—especially considering the following: Espinosa had been shot in the face, Espinosa had witnessed his family members being shot and killed, and chaos occurred during the melee. *See Braughton*, 569 S.W.3d at 608–09.

Considering all the evidence in the light most favorable to the verdict, we conclude that any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence.[4] *See Whatley*, 445 S.W.3d at 166; *Brooks*, 323 S.W.3d at 898–99.

## II.    THE DATE IN THE INDICTMENT

By his second issue, appellant contends that the date of the incident in the indictment was incorrect, and the trial court "never amended the date in the indictment." Appellant argues that although the trial court attempted to orally amend the date in the indictment, that effort was futile; therefore, the trial court should have submitted the case to the jury with the date on the original indictment.[5] Specifically, as we understand it,

---

[4] In addition, under the law of parties, the jury could have reasonably found that the evidence supported a finding that appellant acted with the intent to promote or assist the commission of the offense by soliciting encouraging, directing, aiding, or attempting to aid Big Ronnie to commit the murders. *See* TEX. PENAL CODE ANN. § 7.02. The evidence showed that appellant was involved in an altercation with Sandoval Sr. just prior to the shooting where someone informed the 911 dispatcher that appellant and his brother had boxed in Sandoval Sr. and were attacking Sandoval with a weapon; appellant had a gun; appellant shot at the Sandovals prior to giving the gun to Big Ronnie, who then used the gun to shoot and kill some of the victims; and appellant fled from the scene of the crimes without calling law enforcement. Therefore, even assuming for argument's sake that appellant is correct that the jury should have disregarded Espinosa's testimony, the jury could have still reasonably found that appellant had aided Big Ronnie in killing the victims. *See id.*

[5] An indictment to be sufficient must give day, month and year of the commission of the offense. Failure of an indictment to allege the date of the commission of an offense constitutes fundamental error.

It has been frequently said[, however, that] when an "on or about" date is alleged

19

appellant claims that the trial court orally amended the indictment, which is impermissible, and the record does not contain a signed written order amending the date of the offense in the indictment.[6] By his third issue, appellant "contends that the trial court erred in including the date October 13, 2018, in the jury charge when the indictment alleged May 16, 2019" because the trial court failed to amend the indictment.

In *Guerrero-Acosta v. State*, this Court analyzed the nature of an amendment to an indictment noting that "the court of criminal appeals, explained 'that neither the State's motion to amend nor the trial court's granting thereof is an amendment; rather the two comprise the authorization for the eventual amendment of the charging instrument.'" *See* No. 13-17-00560-CR, 2018 WL 5832097, at *4 (Tex. App.—Corpus Christi–Edinburg Nov. 8, 2018, no pet.) (mem. op., not designated for publication) (citing and quoting *Riney v. State*, 28 S.W.3d 561, 564 (Tex. Crim. App. 2000)). In our analysis of the State's attempted amendment to the indictment, we stated that the purported amendment would "have elevated" the originally charged offense to a third-degree felony. *Id.* at *5. We explained that the State "received authorization to amend the indictment, but it never took any steps to effect the amendment." *Id.* at *4. Additionally, we stated that there is no

---

as the date of the commission of the offense the time mentioned must be a date anterior to the presentation of the indictment and not so remote that prosecution is barred by the statute of limitation[s]. Under such circumstances, the State is not bound by the date alleged, but conviction may be had upon proof that the offense was committed any time prior to the return of that indictment that is within the period of limitation.

*Ex parte Hyett*, 610 S.W.2d 787, 789 (Tex. Crim. App. 1981).

[6] "The requirement of an objection under article 1.14(b) applies only to a defect, error, or irregularity in an indictment, and not to procedural matters such as an error in the process of amending an indictment." *Guerrero-Acosta v. State*, No. 13-17-00560-CR, 2018 WL 5832097, at *4 (Tex. App.—Corpus Christi–Edinburg Nov. 8, 2018, no pet.) (mem. op., not designated for publication). Thus, under these circumstances, appellant was not required to preserve error. *See id.*

authority supporting a conclusion "that an indictment is effectively amended through an oral motion and ruling from the trial court." *Id.* Accordingly, we explained that the State's oral motion to amend the indictment and the trial court's oral grant of such motion "merely authorized the State to amend the charging instrument" and "the State failed to file an amended indictment." *Id.* We held, "While the methods for amending an indictment may vary, it is clear that a written amendment, standing alone or incorporated into the motion or order, must be included in the record for the amendment to be valid." *Id.* In addition, we explained that "the State never filed a written motion containing the proposed amendment" and the State did not "file a written amendment with the trial court after receiving authorization to amend the indictment." We concluded that "under these circumstances . . . the indictment was never amended, and the original indictments remain in full force and effect." *Id.*

The facts here are distinguishable from *Guerrero-Acosta*. Here, the record reflects that on August 5, 2021, the State filed its second amended motion to amend the indictment. The trial court signed an order granting the State's motion to amend the indictment on August 5, 2021, and the amended indictment is included in the record. Thus, unlike the facts of *Guerrero-Acosta*, here, the State received authorization from the trial court to amend the indictment, and the record contains a written amended indictment.[7] *Id.* We overrule appellant's second and third issues.[8]

---

[7] The amended indictment correctly states that the offense was committed "on or about the 13th day of October, 2018." Appellant did not file a motion to quash the amended indictment.

[8] Appellant's third issue is premised on a conclusion that the trial court's amendment to the indictment was ineffective. However, because we have determined that the trial court properly amended the indictment, appellant's third issue is meritless.

### III. ARTICLE 28.10

By his fourth issue, appellant contends that the trial court should have granted his request for a ten-day continuance for trial pursuant to article 28.10(a) of the Texas Code of Criminal Procedure because the trial court allowed the State to amend the indictment two days before trial. *See* TEX. CODE CRIM. PROC. ANN. art. 28.10(a) (providing that once the trial court allows the State to amend the indictment before trial on the merits commences, "[o]n the request of the defendant, the court shall allow the defendant not less than 10 days . . . to respond to the amended indictment."). The State responds that appellant has not shown that he suffered prejudice due to the trial court's denial of his motion for continuance.

### A. Standard of Review and Applicable Law

We review a trial court's ruling on a motion for continuance for an abuse of discretion. *Cruz v. State*, 565 S.W.3d 379, 381 (Tex. App.—San Antonio 2018, no pet.). No abuse of discretion occurs if the trial court's ruling is within the zone of reasonable disagreement. *See id.*

A defendant must show that he was prejudiced by the trial court's denial of his motion for continuance to prevail on appeal. *Heiselbetz v. State*, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995). To establish an abuse of discretion, an appellant must show that the trial court erred in denying the motion for continuance and that the denial actually and specifically prejudiced appellant's defense. *See Gonzales v. State*, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010). That a party "merely desired more time to prepare does not alone establish an abuse of discretion." *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App.

22

1996) (per curiam).

"Article 28.10 of the Code of Criminal Procedure provides the guidelines for when an indictment can be amended." *James v. State*, 425 S.W.3d 492, 499 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). Specifically, an indictment may be amended at any time before the date of trial on the merits commences as to a matter of form or substance. TEX. CODE CRIM. PROC. ANN. art. 28.10(a). "On the request of the defendant, the court *shall* allow the defendant not less than 10 days, or a shorter period if requested by the defendant, to respond to the amended indictment or information." *Id.* (Emphasis added).

Here, the trial court properly allowed the State to amend the indictment prior to trial, but the trial court erred by denying appellant's request for a ten-day continuance. *See id.* Thus, we must determine if appellant was harmed by the trial court's error. *See* TEX. R. APP. P. 44.2; *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997); *Flores v. State*, 139 S.W.3d 61, 65–66 (Tex. App.—Texarkana 2004, pet. ref'd).

**B.      Harm Analysis Applies to an Article 28.10 Violation**

Appellant, citing *Beebe v. State*, argues that because the trial court had a mandatory duty to grant his motion for continuance pursuant to article 28.10 the "error under article 28.10 is categorically exempt from harmless-error analysis." 811 S.W.2d 604, 606 (Tex. Crim. App. 1991). Thus, appellant claims that because this error is exempt from the harmless-error analysis, we must remand the case to the trial court for a new trial pursuant to article 28.10. *See id.* (citing and relying on *Sodipo v. State*, 815 S.W.2d 551, 556 (Tex. Crim. App. 1990) (op. on motion for reh'g)).

23

In *Beebe*, the court of criminal appeals held that article 28.10 was mandatory, and the trial court's denial of the defendant's motion for a continuance was error, which required no harm analysis. *Id.* The court remanded the case to the trial court for a new trial. *Id.*

There are two reasons why we believe that *Beebe* no longer applies to article 28.10. First, *Beebe* relied on *Sodipo* and *Hillin*, which were both implicitly overruled by *Wright v. State*, 28 S.W.3d 526, 531–32 (Tex. Crim. App. 2000). *See Flores*, 139 S.W.3d at 65–66 (acknowledging that although the Texas Court of Criminal Appeals has not explicitly overruled *Sodipo*, "the court's more recent jurisprudence suggests harm analysis is required") (first citing *Matchett v. State*, 941 S.W.2d 922, 928 (Tex. Crim. App. 1996); and then citing *Cain*, 947 S.W.2d at 264).

In both *Sodipo* and *Hillin*, the court of criminal appeals held that an error pursuant to article 28.10 did not require a harm analysis. *Sodipo v. State*, 815 S.W.2d 551, 556 (Tex. Crim. App. 1990) (op. on motion for reh'g) ("We conclude that in order to give effect to the full meaning and intent of Article 28.10, . . . the error complained of in the instant case, i.e., that the State should not be permitted to amend a charging instrument on the day of trial prior to commencing trial on the merits over the defendant's objection, should not be subjected to a harm analysis."); *Hillin v. State*, 808 S.W.2d 486, 488 (Tex. Crim. App. 1991) (plurality op.) (concluding that "the court of appeals was erroneous in its determination under the facts of this case that the harmless error rule applied to Section (a)" of article 28.10).

Subsequently, in *Wright*, the court of criminal appeals relying on *Cain* and Texas Rule of Appellate Procedure 44.2, held that the amendment of an indictment in violation of article 28.10 is subject to a harm analysis. *Wright*, 28 S.W.3d at 531–32 ("We need not determine whether the amendment to the indictment was indeed effective or whether the trial court erred in denying appellant ten days to prepare for trial [pursuant to article 28.10]. Rather, we hold that appellant was not harmed by these events."); *Hamann v. State*, 428 S.W.3d 221, 225 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (stating that we disregard violations of article 28.10 "unless the trial court's error affects the defendant's substantial rights"); *see also Dukes v. State*, 239 S.W.3d 444, 447 (Tex. App.—Dallas 2007, pet. ref'd) (holding that *Cain* and *Wright* implicitly overruled "*Sodipo's* holding that violations of article 28.10 are reversible without a harm analysis"); *Padilla v. State*, 278 S.W.3d 98, 102 n.2 (Tex. App.—Texarkana 2009, pet. ref'd) (recognizing that although "*Sodipo* has not been formally overruled by this state's highest criminal court, that court's subsequent jurisprudence suggests *Sodipo* is, in fact, no longer sound" and listing courts of appeals' decisions that have now determined that a harm analysis applies to Article 28.10 error) (first citing *Trejos v. State*, 243 S.W.3d 30, 41–42 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); then citing *Dukes*, 239 S.W.3d at 446–48; and then citing *Curry v. State*, 1 S.W.3d 175, 178–80 (Tex. App.—El Paso 1999), *aff'd*, 30 S.W.3d 394 (Tex. Crim. App. 2000)); *see also Flores*, 139 S.W.3d at 65–66.

Second, Rule 44.2 was amended after *Sodipo* and *Hillin*. *See Curry*, 1 S.W.3d at 178 (explaining that the rules of appellate procedure in effect as of September 1, 1997, now provide that in criminal cases, we subject all errors constitutional or otherwise to an

25

appropriate harm analysis); *see Sodipin*, 815 S.W.2d at 556 (determining issue prior to September 1, 1997); *Hillen*, 808 S.W.2d at 488 (same); *see also Beebe*, 811 S.W.2d at 606 (same). Regarding an alleged violation of art. 28.10, many of our sister courts of appeal have determined a harmless error analysis is appropriate. *See James*, 425 S.W.3d at 500 (explaining that the court has recognized that *Sodipo's* holding that no harm analysis is required when a 28.10 violation occurs has been implicitly overruled); *Padilla*, 278 S.W.3d at 102; *Trejos*, 243 S.W.3d at 41 (determining whether the trial court's erroneous ruling under article 28.10 was harmless error under Rule 44.2(b)); *Dukes*, 239 S.W.3d at 447; *Flores*, 139 S.W.3d at 66 (recognizing that the court of criminal appeals has not overruled *Sodipo* in the specific context of 28.10 but following *Cain* determining that a harm analysis is required); *Valenti v. State*, 49 S.W.3d 594, 598 (Tex. App.—Fort Worth 2001, no pet.) (assuming that the trial court committed error under 28.10 and applying a harm analysis); *Curry*, 1 S.W.3d at 178; *Westfall v. State*, 970 S.W.2d 590, 596 (Tex. App.—Waco 1998, pet. ref'd); *see also Tucker v. State*, No. 10-17-00154-CR, 2018 WL 6543944, at *4 (Tex. App.—Waco Dec. 12, 2018, pet. ref'd) (mem. op., not designated for publication) (applying a harm analysis to a 28.10 violation after acknowledging that *Sidpo* and *Hillin* were impliedly overruled); *Mason v. State*, No. 10-05-00053-CR, 2006 WL 348578, at *2-3 (Tex. App.—Waco Feb. 15, 2006, pet. ref'd) (mem. op., not designated for publication); *Scoggins v. State*, No. 03-04-00555-CR, 2006 WL 1126185, at *2–3 (Tex. App.—Austin Apr. 27, 2006, pet. ref'd) (mem. op., not designated for publication). Accordingly, we conclude that a harm analysis applies to a violation of article 28.10.

26

Appellant acknowledges that in the event we determine that a harm analysis applies, the error in this issue is statutory, not constitutional, and that rule 44.2(b) is applicable to determine whether the error is reversible. Under rule 44.2(b), any statutory "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b).

> To determine whether the error affected a substantial right, we consider whether the [indictment], as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial and whether prosecution under the erroneous [indictment] would subject the defendant to the risk of being prosecuted later for the same crime.

*Dukes*, 239 S.W.3d at 447–48.

## C.    Change of Date

First, appellant complains that he was harmed when the State amended the date in the indictment because although "the indictment alleged 'on or about' there is a meaningful difference between an offense that occurred in May 2019 and one that occurred in October 2018." This issue has already been addressed by the Texas Court of Criminal Appeals, which concluded that the denial of a continuance on the basis that the State amended the date in the indictment is harmless. *See Wright*, 28 S.W.3d at 532. In *Wright*, the court explained the following:

> It is well settled that the "on or about" language of an indictment allows the [S]tate to prove a date other than the one alleged as long as the date proven is anterior to the presentment of the indictment and within the statutory limitation period. There is no statute of limitations period for murder. Hence, when [the] appellant was indicted for murder, he was put on notice to prepare for proof that the crime happened any time before the presentment of the indictment.

*Id.*

27

Here, the original date and the date of the amended indictment were both prior to the presentment of the indictment. Moreover, there was no confusion shown in the record about the incident, which occurred at a residence where appellant participated in a brawl resulting in the death and injury of multiple members of the Sandoval family. Therefore, appellant was put on notice to prepare for proof that the crime happened any time before the presentment of the indictment. *See id.* (concluding that "[b]ecause both the original date and the date of the attempted amendment, which differed by two days, were prior to the presentment of the indictment, the indictment provided adequate notice for proof of either date"). We overrule appellant's fourth issue to the extent he argues that he was harmed by the trial court's denial of his motion for continuance. *See id.*

**D.     Change of Victim's Name**

Next, appellant asserts that he was harmed by the trial court's denial of his motion for continuance because the State amended the name of one of the victims which should cause this Court to "harbor grave doubt about the sustainability of the convictions absent the error." Specifically, as we understand it, appellant argues that confusion about the victims' names occurred because three of the victims went by the name Juan Sandoval and there was "no evidence of [the victim's alias in the autopsy report] in the trial."

The original indictment listed the victim, Baby Juan, as Jose Martinez Sandoval. The amended indictment listed Baby Juan as Juan Sandoval III, a/k/a Juan Jose Martinez Sandoval III. At trial, the parties and the witnesses referred to Juan Sandoval III as "Baby Juan." There is nothing in the record indicating that appellant or the witnesses were confused about which victim the State accused appellant of killing. When he testified,

appellant was not confused about which victims he allegedly shot, and he specifically denied shooting Baby Juan and claimed that Big Ronnie shot Baby Juan. At no time during the trial was there any indication that the trial court's failure to grant a ten-day continuance had any impact on appellant's ability to prepare a defense. Additionally, appellant does not claim that it did so, and he does not point to anywhere in the record where his defense was affected by the trial court's failure to grant him the ten-day continuance. *See Flowers v. State*, 815 S.W.2d 724, 729 (Tex. Crim. App. 1991) ("The 'substantial right' affected may [require] that the inquiry will be whether the amendment had an impact on the defendant's ability to prepare a defense, or it may concern some other 'substantial right' claimed by a defendant so that the inquiry or focus of prejudice is different depending on the 'substantial right' violated.").

In addition, the amended indictment does not put appellant at risk of being prosecuted later for the same crime. *Dukes*, 239 S.W.3d at 447–48. Therefore, under the circumstances in this case, we are unable to state that appellant suffered any harm from the trial court's denial of his motion for continuance.[9] *See Flowers*, 815 S.W.2d at 729 (finding no prejudice to any substantial rights, when the trial court allowed the State to change the name of the owner of the property from the State to "George Autry" because "[t]he record of the hearings clearly show[ed] that all the parties knew this amendment

---

[9] Appellant does not claim that he was unable to prepare an adequate defense due to the trial court's failure to grant his request for a ten-day continuance, and he does not state that his substantial rights were harmed in any other way. *See Flowers v. State*, 815 S.W.2d 724, 729 (Tex. Crim. App. 1991) ("For example, if the record shows that the amendment is made so as to charge a different occurrence or incident than that originally alleged in the indictment, the substantial rights of a defendant would be prejudiced in part because he has been denied any grand jury review of the offense."). He simply states that we should "harbor grave doubt" of the jury's verdict. That is the extent of his argument.

dealt with the same occurrence of theft as that alleged prior to any amendments" and "[t]he amendment simply altered the allegation in a fact situation where the State had several choices of owners under V.T.C.A. Penal Code, § 1.07(a)(24)"). We overrule appellant's fourth issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
13th day of April, 2023.

30